E. Jeffrey Banchero (SBN 93077)
*ejb@bancherolaw.com*
BANCHERO LAW FIRM LLP
601 California Street, 13th Floor
San Francisco, California 94111
Telephone: (415) 398-7000
Facsimile: (415) 484-7029

Attorneys for Plaintiff
ANTHONY C. LUSTIG

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY C. LUSTIG,<br><br>Plaintiff,<br><br>v.<br><br>AZGEN SCIENTIFIC HOLDINGS PLC,<br><br>Defendant. | CASE NO. 18-CV-07503-HSG<br><br>**DECLARATION OF E. JEFFREY BANCHERO IN SUPPORT OF MOTION FOR ENTRY OF DEFAULT JUDGMENT**<br><br>Hearing Date: January 9, 2020<br>Time: 2:00 P.M.<br>Courtroom: 2<br>Before: Hon. Haywood S. Gilliam, Jr. |

I, E. Jeffrey Banchero, declare:

1.    I am the attorney for plaintiff, Anthony C. Lustig ("Lustig"), in this action.  I have first-hand knowledge of the facts in this declaration.  If called as a witness, I could and would testify competently to these facts.

2.    On June 18, 2018, I sent a letter to AzGen's lawyers, the Kennedys firm of Dublin, Ireland.  A true copy of the letter is attached hereto as **Exhibit G.**

3.    On January 23, 2019, I received a letter from James S. Brown, Duane Morris LLP, in which he referred to defendant as "my client."  Mr. Brown enclosed a Waiver of the Service of

-1-

Summons, which Mr. Brown had signed on defendant's behalf. The letter and waiver are attached hereto as **Exhibit H**. On January 23, 2019, our office filed the Waiver of the Service of Summons with the Court. (Docket #12.)

4.      On January 23, 2019, I received a letter from another Irish law firm representing AzGen, OCWM Law. A true copy of this letter is attached as **Exhibit I** hereto.    The letter states that AzGen would "instruct its California attorneys to challenge any proceedings that are brought on your client's behalf in the California courts on the grounds of lack of jurisdiction and *forum non conveniens.*" The letter demands that Lustig return all of the salary ($166,500) he had received and reimburse AzGen for the travel expenses the company incurred. The letter further demands that Lustig pay AzGen for "the loss of the expected return of $645,071 under a claim of fraudulent inducement." "Take Notice," it concludes, "[t]hat if we do not receive a satisfactory response from you within 21 days of the date hereof, we shall issue proceedings against your client in the Irish courts without further notice ... ."

5.      I responded to the letter from OCWM Law on February 11, 2019. A true copy of my letter is attached as **Exhibit J** hereto

6.      Following the letter from OCWM law, my law office drafted a motion for anti-suit injunction. The motion included a notice of motion, a legal memorandum in support of the motion, and supporting declarations. I was prepared to file the motion in this Court immediately upon notice that AzGen had filed suit against Lustig in Dublin. A copy of the draft memorandum in support of the motion is attached as **Exhibit K** hereto.

7.      On April 16, 2019, I served Plaintiff's First Set of Interrogatories to Defendant, AzGen Scientific Holdings PLC, and Plaintiff's First Request for Production of Documents to Defendant, AzGen Scientific Holdings PLC. The written discovery is attached as **Exhibits L** and **M** hereto. The discovery was designed to elicit facts concerning the value of Lustig's AzGen shares of stock. For example, Request for Production No. 1 demands production of AzGen's financial statements, defined as "income statements, balance sheets, or cash flow statement, or

DECLARATION OF E. JEFFREY BANCHERO                                    18-CV-07503-HSG

other documents that refer or relate to a company's revenues, income, expenses, profits, or losses, or any of these items, including formal, informal, audited, or unaudited documents."

8.     AzGen did not respond to the written discovery.

9.     Our office prepared transcripts of relevant parts of three AzGen-produced videos, "We Know the Way" (**Exhibit N**) and "AzGen Energy-Hydrogen" and "AzGen Energy Statistics" (**Exhibit O).** Lustig describes the source of these videos in his declaration, filed herewith. The transcripts are accurate. For the Court's convenience, I will bring the original recordings to the hearing on the motion.

10.     I was admitted to the California bar in 1980. My résumé is attached as **Exhibit P**.

11.     I practice at the Banchero Law Firm LLP with Mary Banchero. Mary was admitted to the California bar in 1992. Mary works as an associate and also performs work as a paralegal. My hourly rate is $645. Mary's hourly rate for work as an attorney, designated by "MBB," is $395. Her hourly rate for work as a paralegal, designated by "MB," is $195. These hourly rates are reasonable for the San Francisco Bay Area in light of our background and experience.

12.     We began representing Lustig in June, 2018. Ms. Banchero and I recorded our time entries in Case Fox, an on-line billing program, contemporaneously with the work described. Our practice is to record the time we spend working on a matter that day, or the following day, and each of us followed that practice in this case. Attached as **Exhibit Q** are the time and charges for our work representing Lustig in this matter. I wrote the headings (bold typeface) and explanations, in italics, for purposes of this motion. The explanations are true to my knowledge. The total attorneys' fees is **$180,625.50**.

13.     **Exhibit R** sets forth the expenses Lustig incurred in this lawsuit—*e.g.,* filing fees, fees associated with noticing depositions and subpoenaing witnesses, and online expenses for legal research (LEXIS). Each of these expenses is reasonable and was necessarily incurred in the prosecution of this lawsuit. The sum of these expenses is **$1,506.40.**

14.     Our office sent Plaintiff's Motion for Entry of Default Judgment and the supporting declarations to AzGen's corporate address, 6 Mount Street Upper, Dublin 2, Ireland. We also sent

the motion papers to Luis Siemens at the address listed for him in the AzGen corporate records maintained by the Irish authorities.  As of April 25, 2018, Siemens was registered as AzGen's corporate Secretary at the following address, which is where we sent the motion papers: Las Casillas 105, Santa Brigida, SPAIN  35300.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 15, 2019.

E. Jeffrey Banchero

-4-

DECLARATION OF E. JEFFREY BANCHERO

18-CV-07503-HSG

# EXHIBIT G

# BANCHERO
## LAW FIRM LLP

601 CALIFORNIA STREET, SUITE 1300
SAN FRANCISCO, CALIFORNIA  94108

June 18, 2018

*By E-Mail*

Michael Walshe, Esq.
Kennedys
Bloodstone Building
Sir John Rogerson's Quay
Dublin D02 KF24
Ireland
michael.walshe@kennedyslaw.com

Re:   Tony Lustig & AzGen Scientific Holdings PLC

Dear Mr. Walshe,

　　　We represent Tony Lustig.  This is in response to your letter of June 12, 2018.

　　　Your letter fails to mention, let alone address, that your client, AzGen Scientific Holdings PLC ("AzGen") is in arrears for more than two months salary owing to Mr. Lustig, amounting to $41,666, or that AzGen has refused to reimburse Mr. Lustig for $8,638.72 in approved business expenses.  During the weeks leading up to the date of your letter, Mr. Lustig sent multiple e-mail messages to Mr. Gray, AzGen's CEO, requesting payment for his salary and reimbursement for the expenses.  He received, at best, cryptic responses from Mr. Gray, and certainly no explanation as to why the company was now refusing to pay him.

　　　Whatever the merits of AzGen's decision to terminate Mr. Lustig (we address this subject below), in any court proceeding, under California law, Mr. Lustig will be considered an employee of AzGen's.  AzGen's "Letter of Offer" states that Mr. Lustig will assume the position of Chief Investment Officer reporting to the CEO.  The letter provides that "[t]he remittance for this employment position would be $250,000 per annum."  Mr. Lustig worked full-time for AzGen.  He had no other business activity or companies who paid him for services.  Mr. Gray introduced him to top investment bankers, business colleagues, Mehamood Hosein, and the public as the Chief Investment Officer of the company.  He had responsibility for making investments for the company.  All of this is consistent with status as an employee.  *See* Calif. Labor Code § 3357; *Linton v. DeSoto Cab Co, Inc.*, 15 Cal.App.5th 1208, 1217 (2017) (parties' actions determine employer-employee relationship).  Although Mr. Lustig disagrees strongly with the allegations in your letter, the letter itself is evidence

**BANCHERO**
LAW FIRM LLP

Michael Walshe, Esq.
June 18, 2018
Page 2

that Mr. Lustig is an employee of AzGen's, because "[l]iability to discharge for disobedience or misconduct is strong evidence of control" over the individual and, thus, strong evidence of an employer-employee relationship. *Linton,* 15 Cal.App.5th at 1222.

Thus, under California law, AzGen has an absolute, unqualified obligation to pay Mr. Lustig his past-due salary, regardless of any claim for set-off, and regardless of the grounds for termination. AzGen is subject to the jurisdiction of the courts of California, which would apply California law to award Mr. Lustig the amounts he is owed, penalties under the California Labor Code—*i.e.,* an additional one month's salary—and the attorneys' fees Mr. Lustig would be forced to incur. Cal. Labor Code §203; *see Mamika v. Barca,* 68 Cal.App. 4th 487 (1998).

There is no truth to the statement that Mr. Lustig "acted in bad faith and/or failed to disclose a conflict of interest in [his] dealings with CEEK VR," and thus no grounds to invoke clause 4 of the December 29, 2017, agreement. Your letter sets forth no facts to support this vague allegation, and none exist. We thus consider these alleged grounds for termination merely pretextual. The true facts are that AzGen holds a stock interest in CEEK VR, which was a result of Mr. Lustig structuring and closing on the equity investment for AzGen. As with other AzGen portfolio companies, from time to time Mr. Gray would direct Mr. Lustig to assist CEEK VR's CEO with its business, and he would do so. Beginning in early May, Mr. Gray had discussions with CEEK VR's CEO, Mary Spio, to see if both companies could benefit from Mr. Lustig's work. In any event, AzGen does not compete with CEEK VR, and as an investor, the financial interests of the two companies are aligned. As for disclosure of any potential "conflict," Mr. Lustig has text and e-mail messages to and from Mr. Gray relating to Mr. Lustig's work with CEEK VR. In addition, Mr. Lustig referenced his work with CEEK VR on the monthly invoices he submitted to AzGen; *e.g.,* "Facilitated meeting with Mary Spio [CEO of CEEK VR] in SFO and aligned on operating philosophy, goals, and SPV plans (1/31/18); "Assisted CEEK with its ICO strategy and coordinated legal and AzGen review of the SAFT for participation in the CEEK token offering" (2/28/18); "Organized and guided meetings with potential lawyers and bankers in Switzerland and Liechtenstein for CEEK cryptocurrency domicile" (3/31/18). AzGen invested in CEEK VR in November, 2017. At no time did Mr. Gray *ever* mention to Mr. Lustig that he considered his work with CEEK VR to be in "bad faith" or a "conflict of interest."

If AzGen no longer requires Mr. Lustig's services, the company must, without further delay, (i) pay his past-due salary for April and May 2018, an amount totaling $41,666; and, (ii) on July 12, 2018, the last day of the 30-day notice period, pay Mr. Lustig's June salary, an amount totaling $20,833, and July salary through July 12, 2018, an amount totaling $8,064. The company must also immediately (iii) reimburse Mr. Lustig for approved business



**BANCHERO**
LAW FIRM LLP

Michael Walshe, Esq.
June 18, 2018
Page 3

expenses in the amount of $8,638.72. Mr. Gray possesses the receipts and other documentation supporting these expenses, which Mr. Lustig sent to him starting two months ago. In addition, (iv) Mr. Lustig is owed the market value for 9/36 of the 4,000,000 AzGen shares (1,000,000 shares) awarded to him pursuant to the December 29, 2017, agreement, and the subscription price for the balance of the shares (3,000,000 shares). At a $150 million valuation, which is the capital value of the company AzGen claims in a recent promotional video, Mr. Lustig is owed $3,750,000 for his vested AzGen shares.

If AzGen does not pay the amounts currently due within five business days of this letter, we will recommend that Mr. Lustig file suit in California to recover what he is owed. We emphasize that in addition to damages, California law provides for an award of attorneys' fees in bringing suit. Labor Code § 218.5; *see Winterrowd v. American General Annuity Insurance Co.*, 556 F.3d 815, 820 (9th Cir. 2009)(successful plaintiff in civil action for unpaid wages, salary, or other form of employee compensation is entitled to recover attorneys' fees incurred). Including attorneys' fees, AzGen's exposure in such a lawsuit would exceed $4,000,000.

As a final note, your letter states that AzGen "instructed [you] to draw [Mr. Lustig's] attention to the 12 month restrictive covenant agreed to in your contract." We have carefully reviewed the December 29, 2017, agreement between AzGen and Mr. Lustig, and we find no such covenant.

Very truly yours,

E. Jeffrey Banchero

# EXHIBIT H

# DuaneMorris*

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
TAIWAN
BOSTON
HOUSTON
AUSTIN
HANOI
HO CHI MINH CITY

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
A GCC REPRESENTATIVE OFFICE
OF DUANE MORRIS

ALLIANCES IN MEXICO
AND SRI LANKA

JAMES S. BROWN
DIRECT DIAL: +1 415 957 3090
PERSONAL FAX: +1 415 723 7365
E-MAIL: JamesBrown@duanemorris.com

www.duanemorris.com

January 22, 2019

*Via Regular Mail*

E. Jeffrey Banchero
Banchero Law Firm LLP
601 California Street, Suite 1300
San Francisco, CA 94108

    **Re:**    *Anthony C. Lustig v. AzGen Scientific Holdings Plc*
            USDC, Northern District of California, Case No. 18-cv-07503-HSG

Dear Mr. Banchero:

    Enclosed please find the signed Waiver of the Service of Summons, executed on behalf of my client Defendant AzGen Scientific Holdings Plc, in the above-entitled matter.

               Very truly yours,

               DUANE MORRIS LLP

               James S. Brown

Enclosure

DUANE MORRIS LLP

SPEAR TOWER, ONE MARKET PLAZA, SUITE 2200        PHONE: +1 415 957 3000   FAX: +1 415 957 3001
SAN FRANCISCO, CA 94105-1127
DM2\9594510.1

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | | |
|---|---|---|
| Anthony C. Lustig | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   4:18-cv-07503-HSG |
| AzGen Scientific Holdings PLC | ) | |
| *Defendant* | ) | |

## WAIVER OF THE SERVICE OF SUMMONS

To:   E. Jeffrey Banchero
    *(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from           01/10/2019           , the date when this request was sent (or 90 days if it was sent outside the United States).  If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date:   01/22/2019

                                               *Signature of the attorney or unrepresented party*

AzGen Scientific Holdings Plc                       James S. Brown
*Printed name of party waiving service of summons*            *Printed name*

                                               Duane Morris LLP
                                               Spear Tower, One Market Plaza, Suite 2200
                                               San Francisco, CA 94105-1127
                                               *Address*

                                               JamesBrown@duanemorris.com
                                               *E-mail address*

                                               415.957.3090
                                               *Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint.  A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court.  By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

# EXHIBIT I



E Jeffrey Banchero
Banchero Law Firm LLP
601 California Street, Suite 1300
San Francisco, CA 94108
USA

ejb@bancherolaw.com

**YOUR REF:**          **OUR REF:** MUW/BZF          **DATE:** 23 January 2019

Dear Sirs

**OUR CLIENT: AZGEN SCIENTIFIC HOLDINGS PLC**
**YOUR CLIENT: TONY LUSTIG**

We refer to the above matter and your letter of 18 June last.  Please note that we have taken over this matter from our client's previous firm of Irish solicitors, Kennedys.

Your letter purports to apply California law to this matter.  Given that our client, the company that engaged your client, is located in Ireland and your client carried out the substantial part of his services in Europe, we say that the proper governing law in this instance is Irish law.  Furthermore, given that the key witnesses, apart from your client, are in Europe – Luis Siemens in Spain and Dublin; Mary Spio in London and Paul Gray frequently in Dublin – it is a matter of convenient forum that any proceedings are issued and heard in the Irish courts.

To that end, our client has instructed its California attorneys to challenge any proceedings that are brought on your client's behalf in the California courts on the grounds of lack of jurisdiction and *forum non conveniens*.

We next address the capacity in which your client was engaged by our client.  You contend he was an employee, which is denied.  While our client's letter of August 1, 2017 headed *"Letter of Offer"* refers to an employment contract, this offer was superseded by our client's letter of December 29, 2017 headed *"Revised Contract"*.  In that letter it was made clear that your client was being engaged as a contractor and indeed your client duly performed the revised contract by presenting monthly invoices to our client in the capacity of contractor.

Partners: Philip O'Connor, Michael Walshe, Carol Maguire, Edel Conway
Consultant: Peter McShane   Solicitors: Brendan Frawley, Susan Cleary, Jamie Kelly, Ann Matthews
OCWM LAW is a firm of solicitors regulated by the Law Society of Ireland - VAT REG: 3556590HH

Under Irish law, there are a number of tests to determine whether a person is an employee or a contractor. Chief among these is the control test, set out in *Roche v Patrick Kelly and Co Ltd* [1969] IR100 by Mr Justice Walsh as follows: "...*the master's right to direct the servant not merely as to what is to be done but how it is to be done*". In the instant matter, your client was self-directing. He decided when and where to arrange meetings purportedly on behalf of our client, flying to London and Zurich and Dublin at little notice, not circulating a proper agenda for said meetings and asking the principals of our client at the last minute to attend such that it was often impossible for them to do so.

We say "purportedly on behalf of our client" because what has emerged is that your client in arranging these trips was in fact seeking to feather his own nest by lobbying for a position with CEEK VR. He was imparting proprietary information and confidential details of our client's business strategy to a third party to serve his own agenda. He encouraged AzGen to invest millions in the CEEK tokens for the now apparent purpose of assisting his transition to a new $350,000 a year job in a proposed CEEK umbrella company, in which he would be given a 10% shareholding. So diligent was your client in courting CEEK VR that the said company was unaware your client was engaged by our client and instead assumed he was acting on his own account and was funding his time and travel expenses from his own pocket.

Your client's double-dealing only came into our client's knowledge when the CEO of CEEK, Mary Spio, contacted our client to give notice of the proposed 10% shareholding being negotiated by your client for himself. Ms Spio also informed our client that your client offered to raise $150 million for the new CEEK umbrella company, in which he was to be given the aforesaid 10% shareholding. This was contrary to his duty of loyalty to our client.

It is clear that your client acted in bad faith and failed to disclose a conflict of interest, in breach of the terms of his engagement with our client. He made representations to our client that were contrary to the position he was presenting to CEEK. As set out in our previous letter, such eventuality is provided for in Clause 4 of the contract contained in the aforementioned letter from our client of December 29, 2017. Accordingly, your client has forfeited any right to receive shares in our client. We understand that no shares have in fact been transferred and consequently the matter of retransfer does not arise.

Your client's actions have contaminated our client's relationship with CEEK to the extent that our client has been deprived of an opportunity to enter into a joint venture with CEEK VR to set up a special purpose vehicle (SPV). Furthermore, your client's actions have resulted in a drop in the value of the CEEK VR TOKENS of $95,321 or 95% of the initial investment. Your client represented in writing on several occasions that the tokens in questions would go as high as $0.50. They are now trading at $0.0036 - a loss in expected return of $645,071.

Furthermore, the two investments that your client proposed from his network to our client in which AzGen invested an aggregate amount of $1.9 million are now in financial distress or have not performed according to the due diligence plans.  Consequently, your client has no right to any part of the claimed performance bonus of $100,000.

Your client presented monthly invoices to our client for payments and travel expenses on a false premise and in breach of trust.  He made misrepresentations to our client and acted against our client's business interests.  Our client is entitled to recover from your client any monies that were received by him under false pretences and/or deceitfully and/or fraudulently.

In default of an amicable arrangement being reached between your client and ours, we are instructed to issue proceedings against your client in the High Court in Dublin for breach of trust, fraudulent misrepresentation and unlawful disclosure of confidential information, and damages will be sought under the following heads:

1. Recovery of monthly payments to your client in the aggregate amount of $166,500.
2. Recovery of expenses paid to your client in the aggregate amount of $147,708 ($41,400 in direct expenses and $106,308 in travel agent expenses).
3. Fall in the value of the CEEK VE TOKENS in the amount of $95,321 and the loss of the expected return of $645,071 under a claim of fraudulent inducement.
4. Loss of prospective income or delayed income from the Quarrio and CEEK investments and their respective SPVs in an amount to be determined by the court.

**TAKE NOTICE** that if we do not receive a satisfactory response from you within 21 days of the date hereof, we shall issue proceedings against your client in the Irish courts without further notice and we will rely on this letter to fix your client with the costs incurred.

**Yours faithfully**

*OCWM Law*

**OCWM LAW**

**cc:** James S. Brown, Partner, Duane Morris LLP

# EXHIBIT J

# BANCHERO
## LAW FIRM LLP

601 CALIFORNIA STREET, SUITE 1300
SAN FRANCISCO, CALIFORNIA  94108

February 11, 2019

*By E-Mail*

Brendan Frawley, Esq.
OCWM Law
Kilmore House
Spencer Dock
Dublin 1
Ireland
*brendan.frawley@ocwmlaw.com*

> Re:   Lustig v. AzGen Scientific Holdings PLC
>        (U.S. District Ct. No. 5:18-cv-75030)

Dear Mr. Frawley,

This is in response to your letter of January 23, 2019.

We filed suit on Tony Lustig's behalf in California because his employer, your client, AzGen Scientific Holdings PLC ("AzGen"), failed to pay his salary for more than three months, an amount in excess of $70,000, and refused to reimburse Tony for more than $7,000 in approved business expenses. Under the terms of his employment contract, AzGen awarded Tony shares of stock in AzGen, which he paid for. According to the contract, AzGen is required to pay Tony for the value of a portion of these shares. All of this is spelled out plainly in the complaint.

Your letter does not contest Tony's entitlement under the contract to unpaid salary and unreimbursed expenses. Instead, you assert that AzGen is entitled to offset these admitted debts by clawing back the full amount of the salary Tony earned while working for AzGen. Not only this, you assert that Tony is liable in damages for expenses AzGen paid for Tony's business travel, after directing him to travel on AzGen's behalf and pre-approving the expenses. You also claim Tony is somehow liable for the "loss of prospective income or delayed income from … investments" AzGen made while Tony worked for the company. It is astonishing that, even with San Francisco-based lawyers



**BANCHERO**
LAW FIRM LLP

Brendan Frawley, Esq.
February 11, 2019
Page 2

advising AzGen, the company asserts these unsupported claims, none of which is actionable in California.

Tony has resided and worked in California for most of his professional life. AzGen sought to employ him, at least in part, because it wanted a presence in Silicon Valley. Tony's offer letter states that his "role will be based in the San Francisco, California area." The two companies you mention in your letter that AzGen invested in—CEEK VR and Quarrio Corporation—established headquarters in California. In short, Tony's employment is governed by California law, and AzGen is subject to the federal court's jurisdiction in California. Tony is an employee, and AzGen has an absolute, unqualified obligation to pay Tony his past-due salary and unreimbursed expenses, regardless of any claim for set-off or grounds for termination. Calif. Labor Code §221("It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee"); *Sciborski v. Pacific Bell Directory*, 205 Cal.App.4th 1152, 1166 (2012)("California law prohibits an employer from deducting amounts from an employer's wages, even as a setoff for amounts clearly owed by the employee").

There is no truth, in any event, to the statement that Tony "presented monthly invoices to our client [AzGen] for payments and travel expenses on false premise and in breach of trust." Your letter sets forth no facts to support this vague allegation, and none exist. We thus consider these alleged grounds for recoupment—which, we emphasize, no court would ever authorize—as merely pretextual.

The true facts, as we explained months ago to AzGen's lawyers, and as spelled out in the complaint, are that AzGen and its officers were fully aware of, and actually directed Tony's work with CEEK VR and Quarrio. Witness testimony and documentation in the form of texts and e-mail messages will show that Paul Gray, AzGen's CEO, Mary Spio, the CEO of CEEK VR, and Tony were working together to promote a joint-venture relationship between AzGen and CEEK VR. As these discussions progressed, Mary Spio developed a belief that Tony could help with CEEK VR's business, which she and Gray knew would be in the best interests of AzGen. On several occasions, Mary Spio discussed with Paul Gray a possible future role for Tony with CEEK VR. Neither Ms. Spio nor Tony made any attempt to mislead AzGen. In fact, the discussions were purely exploratory. Contrary to your letter, Tony had no agreements with CEEK VR, did not work for CEEK VR, and received no compensation from CEEK VR.


**BANCHERO**
LAW FIRM LLP

Brendan Frawley, Esq.
February 11, 2019
Page 3

  Threatening to sue Tony in Dublin, Ireland in response to Tony's lawsuit, in which he asserts his right to wages earned in California and other contractual benefits, is an egregious form of attempted intimidation. The employment contract, which AzGen's lawyers drafted, does not include a choice-of-forum clause, or a choice-of-law clause designating Ireland. It states, instead, that Tony's work would be based in California. As an individual residing in San Jose, California, Tony would be hard pressed—as AzGen surely knows—to defend himself in the Irish courts. Tony's claims and any counter-claims by AzGen can and must be litigated in the pending action. The district court here would undoubtedly view a lawsuit in Ireland for what it is—an attempt by AzGen to avoid obligations to a California employee by initiating duplicative and vexatious litigation in a distant forum.

  Your letter states that AzGen will file suit in the High Court in Dublin within 21 days of January 23 unless "an amicable arrangement" can be reached between the two sides. For reasons set forth in this letter, we urge AzGen to reconsider, and withdraw the threat of a foreign lawsuit. We are open to settlement discussions, and would welcome a good-faith offer from AzGen.

       Very truly yours,

       E. Jeffrey Banchero

Cc: James S. Brown
   Duane Morris LLP

# EXHIBIT K

1  E. Jeffrey Banchero (SBN 93077)
   *ejb@bancherolaw.com*
2  BANCHERO LAW FIRM LLP
   601 California Street, 13th Floor
3  San Francisco, California 94108
   Telephone: (415) 398-7000
4  Facsimile: (415) 484-7029

5
   Attorneys for Plaintiff
6  ANTHONY C. LUSTIG

**DRAFT   2/25/19 4:00 P.M.**
**BANCHERO LAW FIRM LLP**

7

8              **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10

11  ANTHONY C. LUSTIG,                    CASE NO. 18-CV-07503-HSG

12              Plaintiff,                **PLAINTIFF'S NOTICE OF MOTION
                                          FOR ANTI-SUIT INJUNCTION;
13       v.                               MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT
14                                        THEREOF**
    AZGEN SCIENTIFIC HOLDINGS PLC,
15                                        **Date:**
              Defendant.
16                                        **Time:**

17

18          **NOTICE OF MOTION FOR ANTI-SUIT INJUNCTION**

19          PLEASE TAKE NOTICE that on March ___, 2019, or as soon thereafter as this motion

20  may be heard, in Courtroom ___ of the above entitled Court, [address], plaintiff, Anthony C.

21  Lustig, will move this Court for an anti-suit injunction prohibiting defendant, AzGen Scientific

22  Holdings PLC, or anyone acting in concert with defendant, from doing the following, until further

23  order of this Court:

24          1.      Prosecuting the civil action pending in Ireland against plaintiff, Anthony C. Lustig,

25  entitled _____ (the "Irish action");

26          2.      Initiating, either directly or indirectly, any other action or proceeding against

27  plaintiff that arises or otherwise relates to his employment with defendant, including any action or

28

                                          -1-
    ──────────────────────────────────────────────────

1  proceeding that arises or relates to the Letter of Offer plaintiff signed with defendant, dated

2  August 1, 2017, or the Revised Contract, dated December 29, 2017, that plaintiff signed with

3  defendant.

4      Further, plaintiff will request that the injunction require defendant to:

5      3.    Take all steps necessary to dismiss the Irish action; and

6      4.    Provide plaintiff with written notice of each step taken to carry out the terms of the

7  injunction, as well as notice of any action taken by the court in the Irish action, within forty-eight

8  hours of such steps or notice.

9      Plaintiff submits this motion pursuant to Rule 65 of the Federal Rules of Civil Procedure

10 on grounds that the factors specific to an anti-suit injunction, as determined by the Ninth Circuit

11 Court of Appeals, weigh in favor of granting the injunction, as described in the Memorandum of

12 Points and Authorities, which follows.

13     This motion is based on the Memorandum of Points and Authorities; the accompanying

14 declarations of plaintiff, Anthony C. Lustig, and E. Jeffrey Banchero, and documentary exhibits

15 thereto; and upon such further evidence and argument as may be presented at the hearing on this

16 motion.

17                    **MEMORANDUM OF POINTS AND AUTHORITIES**

18 **I.    INTRODUCTION**

19     This case is in federal court on diversity jurisdiction.  The plaintiff, Anthony C. Lustig

20 ("Lustig"), sues to recover unpaid salary he earned while working for defendant, AzGen Scientific

21 Holdings PLC ("AzGen"), preapproved amounts he spent out-of-pocket working and traveling on

22 AzGen's behalf, and the value of his AzGen shares of stock—all as promised by a written

23 employment contract.

24     Rather than pay Lustig what he is owed, or defend Lustig's claims before this Court,

25 AzGen filed suit in the High Court of Dublin, Ireland.  In the lawsuit, _____ (the

26 "Irish action"), AzGen denies Lustig is owed anything, and it seeks to recover, in damages, the

27

28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1  salary Lustig earned while he was employed, business expenses AzGen incurred, and "lost

2  profits" on investments which, the suit alleges, Lustig recommended.

3         Lustig resides in California. His employment contract with AzGen provides that his

4  position is "based in the San Francisco/California area." AzGen recruited him, in part, because it

5  wanted a presence in Silicon Valley. Lustig, who worked full-time for AzGen, spent most of his

6  time working in California. He is entitled to sue his employer in California for wages and other

7  employment benefits he is owed.

8         The Irish action involves the same two parties that are before this Court, and it involves

9  the same issues, all arising out of Lustig's employment. AzGen, a global investment company

10 with substantial assets, filed the Irish action knowing it would be difficult and expensive for

11 Lustig to defend himself in Ireland while prosecuting claims before this Court. The Court here

12 can adjudicate fully the disputes between the parties, which makes the Irish action duplicative and

13 unnecessary.   More than this, if the Irish action were allowed to proceed, it would frustrate

14 important public policy in this forum—*i.e.*, a California resident-employee's entitlement to wages,

15 and his right to file suit against his employer in California to recover amounts owed to him under

16 an employment contract.

17        On these facts, Lustig is entitled to an anti-suit injunction prohibiting AzGen from

18 prosecuting the Irish action. There is controlling precedent in the Ninth Circuit for the injunction,

19 as we now show.

20 ## II.    STATEMENT OF FACTS

21

22        In the spring of 2017, a recruiter sent Lustig an e-mail message asking if he would be

23 interested in a position with AzGen, which was looking to hire an executive with experience in

24 finance and acquisitions. (Declaration of Anthony C. Lustig in Support of Motion for Anti-Suit

25 Injunction, ¶5; the "Lustig decl."). Lustig was at home in San Jose when he took the call. (*Ibid.*)

26 The call led to an interview with Paul Gray, the CEO of AzGen, who told Lustig that he could

27 help AzGen from Silicon Valley. (*Ibid.*)

28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1     In June, Gray and Lustig exchanged text messages about the terms of an employment

2  contract.  Gray wrote, "Will you be living in California or moving to another state?  *The*

3  *justification of contract should be where you live.  Sorry I mean jurisdiction.*"  (*Id.*, ¶6 & Exh. C.)[1]

4  Lustig replied, "[O]kay to write it for jurisdiction in California." (*Ibid.*)  Gray replied, "Super.

5  Will get you cover letter with terms.  *We will have to work on contract together with California*

6  *attorney for your protections.*  Our firm here is coordinating." (*Ibid.*)

7     On August 1, 2017, AzGen sent Lustig a Letter of Offer stating, "We are delighted to be

8  in a position to offer you the role of Chief Investment Officer with AzGen … .  This offer is based

9  on an employment contract to be provided and the role will be based in the San Francisco,

10  California area." (*Id.*, ¶2 & Exh. A.)  The parties executed the Letter of Offer, and Lustig began

11  work. (*Ibid.*)

12     In December, as the Letter of Offer contemplated, AzGen sent Lustig a Revised Contract,

13  which also provides that Lustig would "be based in the San Francisco/California area." (*Id.*, ¶3 &

14  Exh. B, 1st Amend. Compl.)  It provides that "[t]he remuneration for the employment position

15  would be US $250,000 per annum," and it provides "for an allotment of 4,000,000 shares in the

16  capital of AzGen," which vested over time according to a formula in the contract.  "The entire

17  allotment" of shares, the contract states, "has been approved [by the AzGen board] in a single

18  tranche." (*Ibid.*)  Lustig signed the Revised Contract in January, 2018. (*Ibid.*)

19     Lustig spent a majority of his time working for AzGen from home in San Jose.  The work

20  included telephone calls, e-mail messages, and text messages with AzGen's officers and other

21  AzGen representatives. (*Id.*, ¶8.)  Lustig was involved in negotiations that led AzGen to invest in

22  two companies located in California, C.Corp. and Q.Corp. (*Id.*, ¶9.)  Gray and another AzGen

23  officer, Luis Siemens, flew to California in connection with these investments.  *Id.*, ¶¶9-10.)

24  Lustig met with Gray in California on several occasions, and with Siemens at least twice. (*Ibid.*)

25  AzGen entered into an operating agreement for an LLC related to its investment in C.Corp. (*Id.*,

26

27  _____

[1] All emphasis in this memorandum is added unless otherwise noted.

28

1  ¶12 & Exh. D.)  The agreement contains a clause entitled "Arbitration and Consent to

2  Jurisdiction" that provides for arbitration in San Francisco.  (*Id.*, ¶12 & Exh. D, p. 19.)

3       In June, 2018, AzGen terminated Lustig's employment.  At the time, AzGen was in arears

4  on Lustig's salary for more than two months, and the company owed him for monies he had spent

5  traveling on AzGen business, expenses which AzGen had preapproved.  The unpaid salary, which

6  now includes salary for an additional thirty-day notice period—amounts to more than $70,000,

7  and the unpaid business expenses to more than $7,000.  Lustig demanded payment, and he

8  demanded that AzGen pay him the market value for his vested AzGen shares of stock, as provided

9  for in the employment contract.

10       AzGen refused, and this lawsuit followed.  The complaint was filed on December 13,

11  2018.  It states causes of action for breach of contract, nonpayment of wages under California

12  Labor Code 201(a), and waiting time penalties under California Labor Code 203(a).  A First

13  Amended Complaint was filed on January 9, 2019.  On January 23, 2019, AzGen's lawyers signed

14  a Waiver of Service of Summons, agreeing to accept service.  By rule, AzGen is required to serve

15  an answer or Rule 12 motion on or before April 10, 2019.

16       On February __, lawyers in Dublin, Ireland filed an action in the High Court of Dublin,

17  *AzGen Scientific Holdings PLC v. Anthony C. Lustig*, No. _____.  (Declaration of E. Jeffrey

18  Banchero in Support of Motion for Anti-Suit Injunction, ¶2 & Exh. E.)  Lustig's attorneys

19  received a copy of the complaint in the Irish action on February __.  (*Ibid.*)

20       This motion was filed [   ] days later.

21  **III.  STANDARD FOR ANTI-SUIT INJUNCTION**

22       "A federal district court with jurisdiction over the parties has the power to enjoin them

23  from proceeding with an action in the courts of a foreign country, although the power should be

24  used sparingly."  *E & J Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006),

25  *quoting Seattle Totems Hockey Club, Inc. v. National Hockey League,* 652 F.2d 852, 855 (9th Cir.

26  1981).  "The injunction operates in personam: the American court enjoins the claimant, not the

27  foreign court."  *Gallo*, 446 F.3d at __.  A plaintiff seeking to enjoin a defendant from prosecuting

28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1   a foreign lawsuit "need not meet our usual test of likelihood of success on the merits of the

2   underlying claim to obtain an anti-suit injunction." *Ibid.*   "Rather," the party "need only

3   demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the

4   injunction." *Ibid.*

5          *Gallo* and *Applied Medical Distribution Corp. v. Surgical Co. BV*, 587 F.3d 909 (9th Cir.

6   2009), "establish a three-part inquiry for assessing the propriety of such an injunction." *Microsoft*

7   *Corp. v. Motorola , Inc.,*  696 F.3d 872, 881 (9th Cir. 2012); *see generally Parasoft Corp. v.*

8   *Parasoft S.A.,* 2015 U.S. Dist. LEXIS 182143, p. *16 (C.D. Calif. 2015)("Given that the Ninth

9   Circuit has repeatedly reversed district courts for failure to issue an anti-suit injunction where the

10  *Gallo* test is met, this Court will proceed under the assumption that, if the *Gallo* factors are

11  satisfied, an anti-suit injunction should issue").

12         "First, we determine 'whether or not the parties and the issues are the same' in both the

13  domestic and foreign actions, 'and whether or not the first action is dispositive of the action to be

14  enjoined.' " *Microsoft Corp. v. Motorola , Inc.,*  696 F.3d at 881, *quoting Gallo*, 446 F.3d at 991.

15  "Second, we determine whether at least one of the so-called *Unterweser* factors applies.  Finally,

16  we assess whether the injunction's 'impact on comity is tolerable.' The Unterweser factors are a

17  disjunctive list of considerations that may justify a foreign anti-suit injunction, first articulated by

18  the Fifth Circuit in *In re Unterweser Reedereei GMBH,* 428 F.2d 888, 896 (5th Cir. 1970), and

19  adopted by this court as instructive in *Seattle Totems*, 652 F.2d at 855.  The full list of Unterweser

20  factors is as follows: [w]hether the foreign litigation . . . would (1) frustrate a policy of the forum

21  issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem or*

22  *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations."

23  *Microsoft Corp. v. Motorola , Inc.,*  696 F.3d at 881-82 (citation reversing *Unterweser* on other

24  grounds omitted).

25         The Notice of Motion, which sets forth terms for an anti-suit injunction in this case, is

26  modeled on language from two district court decisions from this circuit, *InterDigital Technology*

27

28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1  *Corp. v. Pegatron Corp.,* 2015 U.S. Dist. LEXIS 85116*, p. *37 (N.D. Cal. 2015), and *Ilyia v. El*

2  *Khoury,* 2014 U.S. Dist. LEXIS 68057*, pp. *4-*5 (W.D. Wash. 2014).

3  **IV.     AZGEN SHOULD BE ENJOINED FROM PROSECUTING THE IRISH ACTION**

4         The factors specific to an anti-suit injunction prohibiting AzGen from prosecuting the

5  Irish action weigh in favor of granting the injunction.

6         **A.     This Court has Jurisdiction.**

7          California's "long-arm" jurisdiction statute "is coextensive with federal due process

8  requirements." The jurisdictional inquiry is the same under state and federal law. *Roth v. Garcia*

9  *Marquez,* 942 F.2d 617, 620 (9th Cir. 1991). Under the well-known test, a court may assert

10 general jurisdiction over a nonresident defendant who has "continuous and systematic" or

11 "substantial" activities in the state. *Hirsch v. Blue Cross, Blue Shield*, 800 F.2d 1474, 1477 (9th

12 Cir. 1986). A court can assert limited, or "specific" jurisdiction over a claim or series of claims

13 when defendant's contacts with the state are not "continuous and systematic." In determining

14 whether limited jurisdiction exists for contract claims, the Ninth Circuit applies a three-part test:

15 "1) the nonresident defendant must have purposefully availed himself of the privilege of

16 conducting activities in the forum by some affirmative act or conduct; 2) plaintiff's claim must

17 arise out of or result from the defendant's forum-related activities; and 3) exercise of jurisdiction

18 must be reasonable." *Roth,* 942 F.2d at 620-621.

19        At the pleading stage, where the jurisdictional inquiry "is based on written materials rather

20 than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional

21 facts." *Schwarzenegger v. Fred Martin Motor Co,* 374 F.3d 797, 800 (9th Cir. 2004) *quoting Myers*

22 *v. Bennett Law Offices,* 238 F.3d 1068, 1071 (9th Cir. 2001). "[U]ncontroverted allegations in the

23 complaint must be taken as true," and "[c]onflicts between the parties over statements contained in

24 affidavits must be resolved in the plaintiff's favor." *Ibid.* (citations omitted).

25        Parties who "reach out beyond one state and create continuing relationships and obligations

26 with citizens of another state are subject to regulation and sanctions in the other State for the

27 consequences of their activities." *Ibid.* (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 473

28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1   (1985).  Courts look to the entire course of the contractual arrangement, including "prior

2   negotiations and contemplated future consequences, along with the terms of the contract and the

3   parties' actual course of dealing." *Burger King*, 471 U.S. at 479.  A contract that creates

4   "continuing obligations to [a] forum resident" satisfies the purposeful availment prong. *Hirsch*,

5   800 F.2d at 1478.

6         Lustig's employment contract is not a one-time transaction, but instead establishes an

7   ongoing "employment position" for an indeterminate length of time.  (Lustig decl., Exh B, 1st

8   Amend. Compl.)  In negotiations preceding Lustig's employment, Paul Gray, AzGen's CEO,

9   assured Lustig that "jurisdiction of [the] contract should be where you live," and AzGen's lawyers

10  would work with a California attorney to "assure protections" for Lustig.  (*Id.*, ¶6 & Exh. C.)  The

11  initial offer letter provides that Lustig's "role will be based in the San Francisco, California area."

12  (*Id.*, Exh. A.)  The Revised Contract reiterates this.  (*Id.*, Exh. B.)  The company paid Lustig's

13  salary by wire transfer to an account Lustig maintained in California.  (*Id.*, ¶7.)

14        Lustig outlines additional instances of AzGen's creating "continuing relationships and

15  obligations in California" in connection with his employment.  Lustig's day-to-day work was

16  performed in California.  (*Id.,* ¶8.)  This included Lustig's sending frequent e-mails and text

17  messages from his California residence to AzGen's officers and representatives.  (*Id.*, ¶8.)  Prior to

18  hiring Lustig, Gray told him he could help AzGen from Silicon Valley.  (*Id.*, ¶5.)  In fact, with

19  Lustig's help, AzGen made investments with two California-based companies, C.Corp. and

20  Q.Corp.  (*Id.*, ¶¶9-11.)  Gray and one other AzGen officer, Luis Siemens, made trips to California

21  in connection with these investments.  *Ibid.*  The arbitration clause in the LLC agreement relating

22  to the C.Corp. investment specifies San Francisco as the location for arbitration (*Id.,* ¶12), which

23  suggests that AzGen is not adverse to litigation in this state.

24        These facts are more than sufficient to demonstrate "purposeful availment." *See, e.g.,*

25  *Wood v. Kinetic Systems, Inc.*, 2010 U.S. Dist. LEXIS 21125,  *15 (Idaho 2010) (finding

26  purposeful availment where defendant employer knew it was hiring an Idaho resident, the

27  employee worked from a home office in addition to extensive travel, wages were sent to Idaho, and

28

-8-

1  the contract explicitly acknowledged his working from the forum state); *Sheets v. Integrated*

2  *Information Utility Systems, Inc.,* 1999 U.S. Dist. LEXIS 9719, *2-3 (Idaho 1999) (finding

3  personal jurisdiction despite employer's claim that employee was merely telecommuting from

4  home forum).

5      For the second prong of the analysis—whether the claims arise out of or result from the

6  defendant's forum-related activities—the Ninth Circuit applies a "but-for" test. *Shute v. Carnival*

7  *Cruise Lines,* 897 F.2d 377, 384 (9th Cir. 1990).   This test is satisfied, because Lustig's claims

8  would not exist "but for" AzGen's forum-related activities— *i.e.,* AzGen's contractual relationship

9  with Lustig. *See Hirsch,* 800 F.2d at 1480 ("Because this contract constitutes [defendant's]

10  contacts with California, the [plaintiffs] satisfy this element of the limited jurisdiction test").

11      Once plaintiff demonstrates "purposeful availment," the burden shifts to defendant to show

12  "a compelling case" that the exercise of jurisdiction would be unreasonable. *Roth,* 942 F.2d at 625.

13  The Ninth Circuit has developed a 7-factor analysis for this inquiry.  Most, if not all, of these

14  factors, which we set out in the margin,[2] favor the Court's exercise of jurisdiction.

15      AzGen would be hard pressed to argue that jurisdiction would be unreasonable when its

16  CEO told Lustig *before he signed the employment contract* that "jurisdiction for the contract"

17  *should be in California,* and that the contract should contain "protections" for Lustig worked

18  through by a California attorney.  (Lustig decl., ¶6 & Exh. C.)  AzGen's "purposeful interjection"

19  was extensive, given its contractual relationship with Lustig and AzGen's ongoing investments in

20  California-based companies. *See Roth,* 942 F.2d at 623.  Lustig is an individual who makes his

21  living in California.  The burden on Lustig of appearing in an Irish lawsuit outweighs the burden of

22  a California forum for AzGen, a global investment company with more than $150 million in assets.

23  (See Lustig decl., Exh. B, 1st Amend. Compl.)  California has a longstanding "fundamental . . .

24

25  ─────────────────
[2]   The seven factors are: "1) the extent of the defendant's purposeful interjection into the forum
26  state's affairs; 2) the burden on the defendant; 3) conflicts of law between the forum and
   defendant's home jurisdiction; 4) the forum's interest in adjudicating the dispute; 5) the most
27  efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective
   relief; and 7) the existence of an alternative forum." *Roth,* 942 F.2d at 623.
28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1  public policy in favor of ensuring worker protections." *Ruiz v. Affinity Logistics Corp.*, 667 F.3d

2  1318, 1324 (9th Cir. 2011).   As one example, California recently adopted section 925 of the Labor

3  Code, prohibiting an employer from requiring an employee to agree to a contract provision

4  requiring the employee to adjudicate contract rights in a forum other than California.[3]Lustig's

5  interest in "convenient and effective relief" in this Court is particularly strong, because Lustig is

6  seeking to recover wages and other employment-contract benefits.   To require Lustig to sue AzGen

7  elsewhere, such as Ireland, would cause him to incur a significant financial burden.   *See Shute*, 897

8  F.2d 387.

9        Because Lustig makes a prima facie showing of jurisdictional facts, *Fred Martin Motor*

10  *Co.*, 374 F.3d at 800, this Court may exercise jurisdiction over AzGen for purposes of issuing an

11  anti-suit injunction and, ultimately, to adjudicate Lustig's claims.[4]

12            **B.    The Parties and Issues in the Two Actions are the Same.**

13        In applying the first prong of the Ninth Circuit test, the issues before the district court and

14  the foreign lawsuit need not be "identical." *Applied Medical*, 587 F.3d at 914.   The test is a

15  "functional inquiry concerning dispositiveness required by *Gallo*." *Ibid.*   "[T]he crux of the

16  functional inquiry in the first step of the analysis is to determine whether the issues are the same in

17  the sense that all the issues in the foreign action . . . can be resolved in the local action." *Id.* at

18  915.

19        In *Seattle Totems Hockey Club, Inc. v. National Hockey League*, 652 F.2d 852 (9th Cir.

20  1981), a minor-league hockey team brought antitrust claims in federal court against the NHL and

21

22

---

23  [3] We discuss Labor Code §925 in section C, below.

    [4] AzGen has not appeared in this action, and may claim it is not subject to jurisdiction.  Lustig files
    this motion at this time because, rather than appearing in this Court and contesting jurisdiction,
24  AzGen filed suit against Lustig in Ireland.  Having chosen this procedural path, AzGen should not
    be heard to complain that this motion is premature.  As the facts adduced in this motion
25  demonstrate, jurisdiction is appropriate.  There is precedent in this circuit for an anti-suit injunction
    in just these circumstances.  In *Parasoft Corp*, 2015 U.S. Dist. LEXIS 182143 (C.D. Cal. 2015), p.
26  *1-*2, the district court for the Central District of California issued an anti-suit injunction
    prohibiting the defendant from prosecuting a civil action in France, even though the defendant had
27  not appeared in the U.S. action.  The court held that plaintiff's written submissions in support of
    the anti-suit injunction established jurisdiction.

28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1   club owners.  The NHL then sued the plaintiff in British Columbia, seeking to have agreements

2   between the parties declared unenforceable.  The Ninth Circuit affirmed the lower court's

3   injunction prohibiting defendants from proceeding with the Canadian action, holding that

4   defendants' claims were compulsory counterclaims under Rule 13 (a).  *Id.* at 854-56 ("the policies

5   animating Rule 13(a) and the rationale of the cases upholding injunctions against subsequently-

6   filed federal court actions *app[y] with equal force to this case where the compulsory counterclaim*

7   *was brought in the courts of Canada*").  Rule 13(a) "requires a defendant in federal court to state

8   as a counterclaim any claim he may have against the plaintiff that arises out of the transaction or

9   occurrence that is the subject matter of plaintiff's claims."  *Id.* at 854 (quoting Rule 13 (a).  "The

10  purpose of requiring a defendant to assert his claim as a counterclaim in a pending action is to

11  prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disptues arising

12  out of common matters."  *Ibid., quoiting Southern Construction Co. v. Pickard,* 317 U.S. 57

13  (1962).

14        Here, the the parties in the two actions are the same.  (Banchero decl., ¶2 & Exh. E.)  The

15  claims pending before this Court, and those alleged in the Irish lawsuit, each arise out of Lustig's

16  employment with AzGen.  Under Rule 13(a) and the rule of *Seattle Totems Hockey Club,* all of the

17  issues raised in the Irish lawsuit are compulsory counterclaims, which must be resolved in this

18  Court.  It follows that "all the issues in the foreign action . . . can be resolved in the local action"

19  satisfying this prong of the *Gallo* test.  *Applied Medical,* 587 F.3d at 915.

20        **C.    Three of the *Unterweser* Factors are Present.**

21        The second prong—whether the "*Unterweser* factors" are present—is satisfied if the

22  district court finds any one factor present.  *Gallo,* 446 F.3d at 990 ("The language from *Unterweser*

23  is disjunctive: if any of the four elements is present, an anti-suit injunction may be proper");

24  *Microsoft Corp. v. Motorola, Inc.,* 696 F.3d at 885-86 (granting anti-suit injunction where two

25  *Unterweser* factors present).

26        The Ninth Circuit, in deciding *Gallo* and *Applied Distribution,* found that foreign lawsuits

27  in those cases satisfied the first factor enunciated in *Unterweser,* because they frustrated the policy

28

-11-

1  in California favoring enforcement of forum-selection clauses.  *Gallo*, 446 F.3d at 992-93; *Applied*

2  *Medical,* 587 F.3d at 918-19.  In each case, the court held that an anti-suit injunction was the only

3  way the parties could effectively enforce such a clause.  *Applied Medical,* 587 F.3d at 918-19

4  ("[W]ithout the availability of anti-suit injunctions, the vitality of forum selection clauses would be

5  impermissibly and improvidently jeopardized").

6  　　　　If allowed to proceed, the Irish action would frustrate policy in California that protects an

7  employee who is owed wages and other contractual employment benefits, and the employee's right

8  to sue for those wages in California.

9  　　　　"Statutory provisions and case law support [plaintiff's] contention [that] the prompt

10  payment of wages due an employee is a fundamental public policy of this state.  '*If an employer*

11  *discharges an employee, the wages earned and unpaid at the time of discharge are due and*

12  *payable immediately.*'"  *Gould v. Maryland Sound Industries, Inc.,* 31 Cal.App.4th 1137, 1147

13  (1995), *quoting* Calif. Labor Code §202.  "Public policy has long favored the 'full and prompt

14  payment of wages due an employee' … '[W]ages are not ordinary debts . . . . [B]ecause of the

15  economic position of the average worker and, in particular, his family, *it is essential to the public*

16  *welfare that he receive his pay promptly.*'  Thus, the prompt payment of wages serves 'society's

17  interests . . . through a more stable job market, in which its most important policies are

18  safeguarded." *Ibid., quoting Pressler v. Donald L. Bren Co.,* 32 Cal.3d 831, 837 (1982) and *Gantt*

19  *v. Security Insurance,* 1 Cal.4th 1083, 1095 (1992); emphasis in original.  As the court in *Gould*

20  points out, Calif. Labor Code §216 provides that an employer is guilty of a misdemeanor for

21  "willfully refusing" to pay wages, 31 Cal.App.4th at 1147, which suggests the policy "involves a

22  broad public interest."  *Ibid.*[5]

23  　　　　In *Microsoft Corp. v. Motorola, Inc.,* 696 F.3d 872, Microsoft filed a breach-of-contract

24  action against Motorola in federal court in the state of Washington.  Several months later, Motorola

25  filed a related patent-infringement suit against Microsoft in Germany.  *Id.* at 879.  The district court

26

27

---

[5]  **[ Lustig is an employee under *Borello* standard.]**

28

-12-

1  found that "Motorola's German litigation was 'vexatious or oppressive' to Microsoft and interfered

2  with 'equitable considerations' "—two other *Unterweser* factors identified by *Gallo* and its

3  progeny—"by compromising the court's ability to reach a just result in the case before it free of

4  external pressure on Microsoft to enter into a 'holdup' settlement before the litigation is complete."

5  *Id.* at 886.  Motorola's foreign lawsuit, the court held, was a "procedural maneuver designed to

6  harass Microsoft" and "interfere with the [U.S. district] court's ability to decide the contractual

7  questions already properly before it."  *Ibid.*  Accordingly, the Ninth Circuit affirmed the lower

8  court's injunction prohibiting Motorola from prosecuting claims in Germany.  *See also Applied*

9  *Medical*, 587 F.3d at 921 (defendant's "subsequent filing of its Belgian action also raises the

10  concern that it is attempting to evade the rightful authority of the district court"); *Seattle Totems*

11  *Hockey Club*, 652 F.2d at 856 ("separate adjudications" in the U.S. and Canada "likely to result in

12  unnecessary delay and substantial inconvenience and expense to the parties and witnesses" and

13  "could result in inconsistent rulings or even a race to judgment"); *Huawei Technologies, Co. v.*

14  *Samsung Electronics Co.*, 2018 U.S. Dist. LEXIS 1784065*, pp. *33-*35 (N.D. Cal. 2016)(anti-

15  suit injunction issued to protect "court's own jurisdiction"; "there is a risk of inconsistent

16  judgments" and foreign lawsuit raises concerns of "forum shopping and engaging in duplicative

17  and vexatious litigation"); *see also Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 626-627 (5ᵗʰ Cir.

18  1996)(anti-suit injunction proper where district court determines that "allowing simultaneous

19  prosecution of the same action in a foreign forum thousands of miles away would result in

20  inequitable hardship and tend to frustrate and delay the speedy and efficient determination of the

21  cause" pending in the United States, *quoting Unterweser*, 428 F.2d at 890); *Quaak v. Klynveld Peat*

22  *Marwick Goerdeter Bedrijfsrevisoren*, 361 F.3d 11, 22 (1ˢᵗ Cir. 2004)("Where, as here, a party

23  institutes a foreign action in a blatant attempt to evade the rightful authority of the forum court, the

24  need for an antisuit injunction crests").

25         Like the foreign lawsuits in these decisions, the Irish action is vexatious and oppressive,

26  and prejudices other equities in Lustig's favor.  Gray assured Lustig that jurisdiction in California

27  was appropriate.  To this end, the employment contract does not include a forum-selection clause

28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1  requiring Lustig to sue in Ireland.  If AzGen had wanted to include such a clause, it could have

2  done so; it would have been required to comply, however, with Calif. Labor Code §925.  This

3  statute prohibits an employer from requiring a California resident to adjudicate employment claims

4  outside of California or depriving the employee of "the substantive protection of California law

5  with respect to a controversy arising in California." [6]  If an employer violates this section of the

6  Labor Code, "the matter shall be adjudicated in California and California law shall govern the

7  dispute."  (Labor Code §925(b).)

8         It would be manifestly unjust and inequitable to allow AzGen to prosecute claims against

9  Lustig in Ireland when California statutory law would have prevented AzGen from including a

10  clause in Lustig's employment contract requiring him to do just that.  There is no authority for such

11  an end-run around the prohibitions of the Labor Code.  And, of course, it would be exceedingly

12  difficult for Lustig to invoke the "substantive protections of California law"—as Labor Code §925

13  prescribes— if Lustig were forced to litigate in Ireland.  It would also be exceedingly difficult and

14  expensive for Lustig to do so—especially while prosecuting related claims in this Court.

15         Lustig filed the complaint in this action in early December, 2018—six months after

16  AzGen fired him.  AzGen filed the Irish lawsuit more than two months after that.  As in *Applied*

17  *Medical, Microsoft Corp. v. Motorola, Inc.,* and several other decisions in this Circuit in which

18  anti-suit injunctions have issued, the Irish lawsuit appears to be a "procedural maneuver" designed

19  to "interfere with the [U.S. district] court's ability to decide the contractual questions already

20  properly before it."  *Microsoft Corp. v. Motorola, Inc.,* 696 F.3d at 886.  The Irish lawsuit creates a

21  needless risk of inconsistent judgments, another factor that the Ninth Circuit decisions emphasize.

22  *See generally Huawei Technologies, Co. v. Samsung Electronics Co.*, U.S. Dist. LEXIS 1784065 at

23  *35.

24         This case satisfies three of the four *Unterweser* factors.

25

26  _____

[6]  Labor Code §925 does not apply to an individual represented by legal counsel.  (Subsection (e).)
27  Lustig was not represented by legal counsel during his employment negotiations with AzGen.
    (Lustig decl., ¶3.)
28

-14-

1

### D.   An Injunction Would Have No Impact on Comity.

2       The third and final prong of the Ninth Circuit test is "whether the injunction's 'impact on

3   comity is tolerable.' *Microsoft Corp. v. Motorola , Inc.,* 696 F.3d at 881.  Comity has been

4   characterized as "a brief and elusive concept—the degree of deference that a domestic forum must

5   pay to the act of a foreign government not otherwise binding on the forum. . . . However, there are

6   limitations on the application of comity.  When the foreign act is inherently inconsistent with the

7   policies underlying comity, domestic recognition could tend either to legitimize the aberration or

8   to encourage retaliation, undercutting the realization of the goals served by comity." *Gallo,* 446

9   F.3d at 995, *quoting Laker Airways Ltd. v. Saben Belgian World Airlines,* 731 F.2d 909, 937 (D.C.

10  Cir. 1984).  The test does not require the court to "calculate [ ] the precise quantum of the

11  injunction's interference with comity, but only that we estimate whether any such interference is

12  so great as to be intolerable." *Microsoft Corp. v. Motorola , Inc.,* 696 F.3d at 886.  "[C]omity is

13  less likely to be threatened in the context of a private contractual dispute than in a dispute

14  implicating public international law or government litigants." *Ibid.*  "The order in which the

15  domestic and foreign suits were filed, although not dispositive, may be relevant to this

16  determination depending on the particular circumstances." *Id.* at 887 (citing *Applied Medical,* 587

17  F.3d at 921 (enjoining party attempting to evade the rightful authority of the district court does not

18  "intolerably impact comity"); *Dependable Highway Express, Inc. v. Navigators Insurance Co.,*

19  498 F.3d 1059, 1069 (9th Cir. 2007)("Comity is not required where the [foreign] action was filed

20  after the U.S. action for the sole purpose of interfering with the U.S. suit"); *see generally Huawei*

21  *Technologies, Co.*, 2018 U.S. Dist. LEXIS 1784065*, pp. *39-*40  (impact on comity "tolerable"

22  in the context of "private contractual dispute" that raises no "public international issue"; district

23  court enjoins Huawei from prosecuting patent-infringement lawsuits in China).

24       The complaint states three claims arising out of Lustig's employment with AzGen, a

25  closely-held, private company.  Lustig filed the action well before AzGen filed suit in Ireland.

26  The claims pending before the Court do not involve a government entity or a public international

27  issue.  For these reasons, and because AzGen appears to have filed suit in Ireland "for the sole

28

Motion For Anti-Suit Injunction
Case No. 18-CV-07503-HSG

1  purpose of interfering" with this Court's ability to adjudicate the claims before it, *Dependable*

2  *Highway Express, Inc.,* 498 F.3d at 1069, comity between the United States and Ireland is not

3  implicated.

4  **V.      THE INJUNCTION MAY ISSUE WITHOUT BOND**

5           Rule 65 (c) of the Federal Rules of Civil Procedure provides that the district court may

6  issue an injunction only if the moving party gives security in an amount that the court considers

7  proper to pay costs and damages sustained by a party found to have been wrongfully enjoined or

8  restrained.  "Notwithstanding the seemingly mandatory language, 'the district court may dispense

9  with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant

10 from enjoining his or her conduct.'"  *InterDigital Technology Corp. v. Pegatron Corp.*, 2105 US.

11 Dist. LEXIS 85116*, p. *36 (N.D. Cal. 2015), *quoting Johnson v. Couturier*, 572 F.3d 1067, 1086

12 (9th Cir. 2009)("Rule 65(c) invests the district court with discretion as to the amount of security

13 required, *if any*")(emphasis in original).  In the *InterDigital Technology* case, the district court

14 issued an anti-suit injunction (TRO) prohibiting defendant from continuing to prosecute a lawsuit

15 in Taiwan.  The court did not require a bond, holding that defendant had "identified no harm it

16 will suffer as a result of a TRO, and has neither quantified nor articulated any damages." *Ibid.*

17 The court reasoned that "no damages exist," in part because a dismissal of the Taiwan action

18 would have no res judicata effect and defendant had identified "no negative consequences to its

19 ability to reinstate the action" if the injunction was later found to be in error.  *Ibid; see also*

20 *Weyerhaeuser Co. v. Novae Syndicate 2007,* U.S. Dist. LEXIS 77216*, p. *5-*6 (W.D. Wash.

21 2018)(declining to impose bond for anti-suit TRO pending hearing on injunction).

22           If this Court issues an anti-suit injunction, it is difficult to conceive what damages, if any,

23 AzGen might suffer in the unlikely event AzGen is later found to be wrongfully restrained.  As we

24 demonstrate, AzGen's claims against Lustig are compulsory counterclaims under Rule 13.  AzGen

25 can, therefore, assert its claims against Lustig in this lawsuit.  If jurisdiction over AzGen is found

26 to be in error, AzGen can reinstate its claims in Ireland.  *Cf. InterDigital Technology*, 2105 US.

27 Dist. LEXIS 85116*, p. *36.

28

1    For these reasons, and in light of all the equities, the anti-suit injunction may issue

2  without bond.

3  **VI.     CONCLUSION**

4    For the foregoing reasons, plaintiff, Anthony C. Lustig, respectfully requests that this

5  Court issue an order enjoining defendant, AzGen Scientific Holdings PLC, from prosecuting the

6  action against plaintiff pending in Ireland.

7

8                                              Respectfully Submitted,

9                                              BANCHERO LAW FIRM LLP

10

11                                             By:_____/s/_____
                                               E. Jeffrey Banchero
12
                                               Attorneys for Plaintiff
13                                             Anthony C. Lustig

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-17-

# EXHIBIT L

E. Jeffrey Banchero (SBN 93077)
*ejb@bancherolaw.com*
BANCHERO LAW FIRM LLP
601 California Street, 13th Floor
San Francisco, California 94108
Telephone: (415) 398-7000
Facsimile: (415) 484-7029

Attorneys for Plaintiff
ANTHONY C. LUSTIG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ANTHONY C. LUSTIG,

      Plaintiff,

  v.

AZGEN SCIENTIFIC HOLDINGS PLC,

      Defendant.

CASE NO. 18-CV-07503-HSG

**PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT, AZGEN SCIENTIFIC HOLDINGS PLC**

(Before the Hon. Haywood S. Gilliam, Jr.)

      Plaintiff, Anthony C. Lustig, serves the following interrogatories pursuant to Rule 33 of the Fed. R. Civ. P.

      In accord with the rule, plaintiff requests that defendant, AzGen Scientific Holdings PLC, answer under oath, within thirty (30) days of receipt, the interrogatories set forth below.

      The interrogatories call for information not only within your personal knowledge but any information you can obtain, including information in the possession of anyone acting on your behalf, such as your attorneys, investigators, and their representatives.

      If you cannot answer the interrogatory completely after exercising due diligence to obtain the information to do so, please so state, and answer the interrogatory to the extent possible,

stating your reason for not being able to answer the remainder.  Also, you must provide whatever information you can as to the unanswered portion.

If the interrogatory asks you to identify a document, you must identify each document sufficiently to allow the plaintiff to make a request to produce the document pursuant to Rule 34 of the Fed. R. Civ. P.

For purposes of these interrogatories, "identify" means, with respect to an individual or business entity, to state the person's name, address, and telephone number; "identify" means, with respect to a document, to state the title of the document, its date, author, addressee(s), recipient(s).

"Person" means an individual, corporation, partnership, limited liability partnership, limited liability company, firm, association, or other entity.

"You" and "your" or "AzGen"shall mean and refer to defendant AzGen Scientific Holdings PLC.

"Plaintiff" or "Lustig" shall mean and refer to Anthony C. Lustig.

"Ordinary shares" shall be used in the same sense, and shall have the same meaning as the phrase "ordinary shares" in the Revised Contract between plaintiff and defendant, dated December 29, 2017, Exhibit A to the First Amended Complaint.

"Value Shares" shall be used in the same sense, and shall have the same meaning as the phrase "Value Shares" in the Revised Contract between plaintiff and defendant, dated December 29, 2017, Exhibit A to the First Amended Complaint.

"Market Value" shall be used in the same sense, and shall have the same meaning as the phrase "Market Value" in the Revised Contract between plaintiff and defendant, dated December 29, 2017, Exhibit A to the First Amended Complaint.

"Revised Contract" shall mean and refer to the agreement between plaintiff and defendant, dated December 29, 2017, Exhibit A to the First Amended Complaint.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

As of the date of the Revised Contract (December 29, 2017), how many ordinary shares in the capital of AzGen were issued and outstanding?

**INTERROGATORY NO. 2:**

As of July 12, 2018, how many ordinary shares in the capital of AzGen were issued and outstanding?

**INTERROGATORY NO. 3:**

As of July 12, 2018, what was the Market Value of the total number of ordinary shares in the capital of AzGen issued and outstanding?

**INTERROGATORY NO. 4:**

How many value shares were allotted to plaintiff under the terms of the Revised Contract?

**INTERROGATORY NO. 5:**

As of July 12, 2018, what was the Market Value of the Value Shares allotted to plaintiff under the terms of the Revised Contract?

**INTERROGATORY NO. 6:**

As of July 12, 2018, what was the Market Value of 1,333,333.33 ordinary shares in the capital of AzGen?

**INTERROGATORY NO. 7:**

As of July 12, 2018, identify each business entity in which you had an ownership or investment interest, and the nature and value of such interest(s).

**INTERROGATORY NO. 8:**

As of December 1, 2018, identify each business entity in which you had an ownership or investment interest, and the nature and value of such interest(s).

**INTERROGATORY NO. 9:**

As of February 15, 2019, identify each business entity in which you had an ownership or investment interest, and the nature and value of such interest(s).

**INTERROGATORY NO. 10:**

As of the date of these responses, identify each business entity in which you have an ownership or investment interest, and the nature and value of such interest(s).

Dated: April 15, 2019

E. Jeffrey Banchero

Attorney for Plaintiff
Anthony C. Lustig

-4-

<u>Proof of Service</u>

At the time of service I was over 18 years old and not a party to this action.  My business address is 601 California Street, Suite 1300, San Francisco, California  94108.  On the date set forth below, I served a true copy of the following documents:

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT, AZGEN SCIENTIFIC HOLDINGS PLC**

**PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT, AZGEN SCIENTIFIC HOLDINGS PLC**

I served the documents, as follows:

X      (BY ELECTRONIC TRANSMISSION) by transmitting the foregoing document(s) by e-mail the party(ies) identified below by using the email address(es) as indicated

James S. Brown                            JamesBrown@duanemorris.com
Anjali Kulkarni                             akulkarni@duanemorris.com
Duane Morris LLP
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127

For forwarding to AzGen Scientific Holdings, pursuant to court order dated March 22, 2019.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed in San Francisco, California on April 16, 2019.

_Mary Bryan_
Mary Bryan

# EXHIBIT M

1  E. Jeffrey Banchero (SBN 93077)
   *ejb@bancherolaw.com*
2  BANCHERO LAW FIRM LLP
   601 California Street, 13th Floor
3  San Francisco, California 94108
   Telephone: (415) 398-7000
4  Facsimile: (415) 484-7029

5  Attorneys for Plaintiff
   ANTHONY C. LUSTIG
6

7                    UNITED STATES DISTRICT COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

10                                          CASE NO. 18-CV-07503-HSG
    ANTHONY C. LUSTIG,
11                                          **PLAINTIFF'S FIRST REQUEST FOR**
               Plaintiff,                   **PRODUCTION OF DOCUMENTS TO**
12                                          **DEFENDANT, AZGEN SCIENTIFIC**
                                            **HOLDINGS PLC**
13         v.

14  AZGEN SCIENTIFIC HOLDINGS PLC,
                                            (Before the Hon. Haywood S. Gilliam, Jr.)
15             Defendant.

16

17

18
           Plaintiff, Anthony C. Lustig, serves the following requests for the production of documents
19
    pursuant to Rule 34 of the Fed. R. Civ. P.
20
           In accord with the rule, plaintiff requests that defendant produce and permit plaintiff to
21
    inspect and copy the documents or electronically stored information – including writings,
22
    drawings, graphs, charts, photographs, sound recordings, images, and other data or data
23
    compilations stored in any medium from which information can be obtained – translated, if
24
    necessary, by the defendant into reasonably usable form, as specifically described below.
25

26

27

28
                                            -1-

The copying or inspecting shall take place at the offices of plaintiff's counsel at 9:30 A.M. on May 20, 2019, or at such other reasonable time and place as agreed to by the attorneys for the parties.

## DEFINITIONS

A.     "Document(s)" means all documents or electronically stored information as defined by F. R. Civ. P. 34 in your possession, custody, or control, including but not limited to electronic communications, which are known or available to you, regardless of whether such documents are possessed directly by you or your agents, officers, directors, employees, representatives, or investigators, or by your attorneys or their agents, employees, representatives, or investigators. "Document(s)" includes the original or, if the original is not within your custody or control, a duplicate of any and all written, printed, typed, drawn, recorded (electronically or otherwise), graphic or photographic matter of any kind or nature, however produced or reproduced, whether sent or received or neither, including all drafts and copies bearing notations, marks, or matter not found on the original and/or duplicate. "Document(s)" shall not be limited in any way as to the form of storage (such as paper, microfiche, personal digital assistant (PDA's), magnetic tape, magnetic disk, CD-ROM, DVD, optical disk, or other electronic storage device).

B.     "Communication" means any communication or attempted communication between two or more persons, in writing, in person, or by telephone or other electronic medium. "Communication" includes the transmittal of information or anything else (whether in the form of ideas, comments, inquiries, or otherwise) and includes both written documents and electronic transmissions, including but not limited to letters, electronic mail communications (e-mail), and transcriptions of voice communications. References to communications with business entities shall be deemed to include present and former officers, managers, supervisors, directors, employees, agents, attorneys or other representatives of such entities.

C.     "Lustig" means plaintiff, Anthony C. Lustig.

D.     "AzGen," "you," "your" or "defendant" means defendant, AzGen Scientific Holdings PLC.

E.     "Person" means an individual, corporation, partnership, limited liability partnership, limited liability company, firm, association, or other entity.

F.     "Refer or relate" means to constitute, refer, reflect, discuss, show, evidence, concern or be in any way logically or factually connected with the matter discussed or identified.

G.     "All" and "any" mean both each and every; the plural includes the singular and vice-versa.

H.     The term "or," "and," or "and/or" shall be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive.

I.     The singular form of a word shall be interpreted as plural and the plural interpreted as singular whenever appropriate in order to bring within the scope of this request any documents that might otherwise be considered beyond their scope.

J.     "Financial statements" means income statements, balance sheets, or cash flow statements, or other documents that refer or relate to a company's revenues, income, expenses, profits, or losses, or any of these items, including formal, informal, audited, or unaudited documents.

K.     "Debt" means an indebtedness AzGen has incurred, in whatever form the indebtedness takes, including loan, line of credit, indenture, bond, or promissory note.

## INSTRUCTIONS

A.     This request requires you to produce all documents that are in your actual or constructive possession, custody or control, or in the possession, custody or control of your attorneys, accountants, representatives, consultants, agents, or anyone else acting on your behalf.

B.     In producing documents, you must produce the original of each writing requested together with all non-identical copies and drafts of that document.

C.     All documents should be produced in the file, folder, envelope or other container in which the writings are kept or maintained by you.  Documents attached to each other should not be separated.

D.      If your response to a particular demand includes an objection, you must set forth in your response the extent of, and the specific ground for, the objection.  In your response, you must also identify with particularity any document responsive to the particular demand that is being withheld from production based upon a claim of privilege or other protection, state the particular privilege or protection being invoked, identify with particularity the documents withheld from production, and provide for each document withheld the following information if known or available to you:  (1) date composed or date appearing on the document; (2) author; (3) number of pages; (4) identity of all persons or entities who saw the original document or saw or received a copy of such document, including the job titles of each person; and (5) subject matter.

E.      This request requires the production of documents as they are kept in the usual course of business, or organized and labeled to correspond with the particular demands set forth below.  If you choose the method of producing the documents as they have been kept in the usual course, the documents are to be produced in the boxes, file folders, bindings or other containers in which documents are found.  The titles, labels or other descriptions of the boxes, file folders or other containers are to be left intact.

### REQUESTS

1.      For the period from January 1, 2017, to the present, AzGen's financial statements.

2.      All documents that refer or relate to contributions of capital made to or received by AzGen, including contributions of capital by shareholders, employees, officers, or other persons.

3.      All documents that comprise, refer, or relate to any debt AzGen has incurred.

4.      All documents that comprise, refer, or relate to **[REDACTED]**.

5.      All documents that comprise, refer, or relate to **[REDACTED]**.

6.      All documents that comprise, refer, or relate to **[REDACTED]**.

7.      All documents that comprise, refer, or relate to any investment by AzGen in Henergy, Inc.

8.      All documents that comprise, refer, or relate to any investment by AzGen in Technologies H2CI, Inc.

9.      All documents that comprise, refer, or relate to any investment by AzGen in My Business Finder.

10.      All documents that comprise, refer, or relate to AzGen's accounting practices and policies.

11.      All documents that comprise, refer, or relate to AzGen's capital structure.

12.      Any agreement AzGen entered into that refers or relates to capital investment in AzGen.

13.      All documents that comprise, refer, or relate to any effort AzGen made to raise capital.

14.      Any agreement AzGen entered into between AzGen and one or more of its shareholders that refers or relates to an ownership interest in AzGen, and all communications that refer or relate to any such agreement.

15.      Any agreement AzGen entered into between AzGen and any other person that refers or relates to an investment, project, or transaction between AzGen and that person, and all communications that refer or relate to any such agreement.

16.      All documents that comprise, refer, or relate to AzGen's board-meeting minutes, and all communications that refer or relate to AzGen's board-meeting minutes.

17.      All documents that comprise, refer, or relate to AzGen's liquidation or wind-down.

18.      All documents that comprise, refer, or relate to AzGen promotional, marketing, or other press-related materials.

19.      All documents that comprise, refer, or relate to AzGen's business plans or financial forecasts.

 

 

_____

E. Jeffrey Banchero

Attorney for Plaintiff
Anthony C. Lustig

1

<u>Proof of Service</u>

2

At the time of service I was over 18 years old and not a party to this action.  My business

3

address is 601 California Street, Suite 1300, San Francisco, California  94108.  On the date set

4

forth below, I served a true copy of the following documents:

5

6

**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO
DEFENDANT, AZGEN SCIENTIFIC HOLDINGS PLC**

7

8

**PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT, AZGEN
SCIENTIFIC HOLDINGS PLC**

9

I served the documents, as follows:

10

X          (BY ELECTRONIC TRANSMISSION) by transmitting the foregoing
           document(s) by e-mail the party(ies) identified below by using the email
           address(es) as indicated

11

12

13

14

James S. Brown                          JamesBrown@duanemorris.com
Anjali Kulkarni                         akulkarni@duanemorris.com
Duane Morris LLP

15

One Market Plaza, Suite 2200

16

San Francisco, CA  94105-1127

17

18

For forwarding to AzGen Scientific Holdings, pursuant to court order dated March 22, 2019.

19

I declare under penalty of perjury under the laws of the State of California that the

20

foregoing is true and correct.  Executed in San Francisco, California on April 16, 2019.

21

22

23

Mary Bryan

24

25

26

27

28

PROOF OF SERVICE
18-CV-07503-HSG

# EXHIBIT N

**EXHIBIT N**

Decl. of E. Jeffrey Banchero in Support of
Plaintiff's Motion for Entry of Default Judgment

*Anthon C. Lustiv v. AzGen Scientific Holdings PLC*
Case No. 18-CV-07503-HSG

Transcript of "We Know the Way"
AzGen Scientific Holdings PLC
2017-2018

EXCERPTS

---

"The skill sets we have added have allowed us to remain in front of ideas that have the potential to be in the billions of dollars, and we've had a lot of success already.  In our first year, we've created $150 million in valuation increase.  This is a pace of over 500% return.  As such, we're looking at $15 billion in potential gains.

We have also developed spheres of influence in acceleration areas and technology hubs across the globe.  We've fostered relationships in Dublin, Silicon Valley, Boston, Washington, D.C., Malaysia, Montreal, and North Carolina, Madrid, Frankfurt, and London.  This has allowed us to create a thriving ecosystem of patents, technologies, and companies that encourage innovation across three key areas of expertise.  Our relationships and investments in life sciences are allowing us to build a $1 billion portfolio of opportunities in technologies and therapies that will be vital for mankind over the next 20 years.  Areas like precision medicine and organ manufacturing have been a dream for years.  Now, they're upon us, and AzGen are right in the middle of it.

Our relationships in advanced technologies sees us work with companies that are right at the forefront of crypto-currencies, virtual reality, and video production, artificial intelligence, and data security in centers of excellence across the globe."

* * * * *
"As we set new milestones for year 2, we're actively redeploying our human capital to handle our growth.  We are continuing our world-wide hunt for new technologies, while globally commercializing the ones we already have.

We are also continuing to build on our global, top-tier relationship network of investment banks and important sovereign wealth funds.  Finally, with our newly formed science and technology advisory board, we are looking to expand our portfolio of amazing companies we already work with.

We have a lot to do, but we are confident we can do it, because we are AzGen, and we know the way."

# EXHIBIT O

**EXHIBIT O**

Decl. of E. Jeffrey Banchero in Support of
Plaintiff's Motion for Entry of Default Judgment

*Anthon C. Lustiv v. AzGen Scientific Holdings PLC*
Case No. 18-CV-07503-HSG

Transcript of "AzGen Energy-Hydrogen" and "AzGen Energy Statistics"
AzGen Scientific Holdings PLC
2017-2018

EXCERPTS

---

"We need to find a way to swap our dependencies on fossil fuels for clean, sustainable, renewable sources of energy.  AzGen Energy has already found one.  Hydrogen is one of the simplest and most abundant chemical elements in our universe.  It is also seen as the final piece in the sustainable energy puzzle."

* * * * *

"At AzGen Energy, we are funding significant growth in this expanding sector.  We have partnered with a Canadian company who has developed a fully patented technology to produce hydrogen using nano-electrolysis.

* * * * *

"The current global hydrogen market is valued at $130 billion and is expected to grow by $150 billion within the next ten years.  Based on the cost per energy unit, AzGen Hydrogen is the cheapest and cleanest energy source per dollar when compared to oil, gas, and other forms of renewable energy, and with the demand for clean energy increasing, we haven't even begun to scratch the surface of what is possible.  Looking to the future, its certain that hydrogen will play an increasingly important part of the global energy system.  With our continued expansion in the emerging markets, AzGen is set to play a vital role in the transition to a sustainable, carbon-free energy sector in the decades to come."

* * * * *

"Our [AzGen's] revolutionary nano-electrolysis process uses 50 times less electricity than any other hydrogen manufacturing system currently in global use."

* * * * *

"As the world switche[s] to more sustainable sources of energy, AzGen Hydrogen is already positioned to disrupt the billion-dollar marketplace with this ground-breaking technology.  With a 6.07% compound annual growth rate, our innovative process is set to revolutionize the world energy sector."

# EXHIBIT P



# BANCHERO
## LAW FIRM LLP

## E. Jeffrey Banchero

**BANCHERO LAW FIRM LLP**
601 California Street, Suite 1300
San Francisco, California 94108
(415) 398-7000
*ejb@bancherolaw.com*

| | |
|---|---|
| Professional Experience | Banchero Law Firm LLP, 2000 – 2004 & 2009 – present. Kastner \| Banchero LLP, October 1, 2004 – 2008. Banchero & Lasater, 1986 - 1999. Civil litigation and appeals. |
| | Associate, Brobeck, Phleger & Harrison San Francisco, 1981 - 1985. |
| | Associate, Skadden, Arps, Slate, Meagher & Flom New York, 1977 - 1979. |
| Teaching | Associate Professor of Law (Evidence Advocacy). Hastings College of the Law, 1985 – 1992. |
| | Instructor, Legal Writing and Research Hastings College of the Law, 1983 - 1984. |
| | Faculty Member, U.S. District Court for the Northern District of California, trial practice program, 1987 - 1992. |
| Court Appointment | Member & Chair, Standing Committee on Professional Conduct for the United States District Court, Northern District of California, 2010 - 2013. |
| Education | J.D.   University of Chicago Law School 1977. A.B.   University of California, Berkeley 1973, with distinction. |

March 2019

| | |
|---|---|
| Other Experience | Research Assistant, Impeachment Inquiry<br>of President Richard M. Nixon, 1973-74<br>Judiciary Committee, U. S. House of Representatives<br>Transcribed tapes of presidential conversations. |
| Admissions | New York 1978 (inactive)<br>California 1980<br>U. S. Courts of Appeals<br> Second, Sixth, and Ninth Circuits<br>U.S. District Courts<br> Northern, Eastern, Central, and Southern Districts of<br>California<br> District of Massachusetts<br> Eastern District of Pennsylvania<br> Eastern District of Michigan |
| Summary of<br>Professional<br>Experience | Jeff has been lead counsel in many jury trials, bench trials,<br>arbitrations, injunction proceedings, and appeals in California<br>and elsewhere in the United States. |

He brings this extensive litigation experience to a complementary employment and transactional practice. Jeff regularly negotiates employment and severance agreements for executives at all levels. He also provides corporate advice to emerging and other small-cap companies and partnerships.

Jeff has obtained jury verdicts for clients in the millions of dollars. In 1991, he obtained a $26.7 million jury verdict for a client in a contract dispute with a Japanese film company. In a more recent trial, a Federal jury in San Francisco awarded his client $1.9 million on a fraud claim, which included $500,000 in punitive damages.

He has handled sales-agent termination cases; intellectual property and trade-secret cases; high-tech licensing disputes; environmental litigation; employment disputes, including wage and stock-option claims; breach of contract and other corporate-control cases; banking, fraud, and real estate cases; and claims by investors in limited partnerships.

His corporate clients have included Philips Electronics North America Corporation, Philips Semiconductors, Inc., Lennar Corporation, The Atchison, Topeka & Santa Fe Railway Co.,

2

The Burlington Northern & Santa Fe Railway Co., Jones-Hamilton Co., General Chemical Corporation, ElectriGroup, Inc., Metabyte, Inc., FS/NY Shoes, Inc., Nelson & Associates, Inc., and CrestPoint Solutions, Inc.

Jeff worked for many years with the Institute for the Study and Development of Legal Systems (ISDLS) in international legal reform.  He helped develop mediation and case-management reforms in courts in India, Bangladesh, and Pakistan.

| | |
|---|---|
| Significant Trials, Arbitrations, and Appeals | ***Cultured Gourmet, LLC v. Klein***<br>(No. CGC-15-544613, San Francisco Superior Court, May 2016) Trial on claims to expel member from California LLC, and for fraud and breach-of-contract.  Judgment for client on all claims, including money damages.   Affirmed on appeal, *Cultured Gourmet LLC and Karen W. Diggs v. Klein*, Nos. A149298 and A148469, California Court of Appeal. |

***Nelson & Associates v. Kurt Nelson***
(AAA Arbitration, Los Angeles, Calif., Sept.-Dec. 2010)
Arbitration on claims to declare valid shareholders agreement and stock-bonus grant and defense of claims for fraud and wrongful-termination; clients were principals of a southern California manufacturer's representative.

***Lozano-Gurley, Inc. v. Northfield Insurance Co***.
(No. CV-057706, Santa Clara Superior Court, October 2008)
Trial on claims against insurance broker for professional negligence – settled successfully after jury was empanelled; case included claims against insurance company for bad-faith after benefits under an insurance policy were denied to client.

***Grewal v. Choudhury***
(No. CV7-4218 CRB, U.S. Dist. Court, N.D. Calif., August 2008)
Jury verdict for $1.4 million on all counts, including fraud, in favor of client who had loaned money to software developer; in second phase of trial, jury awarded client $500,000 in punitive damages.

3

*French Sole Shoes, Ltd. & FS/NY Shoes, Ltd. v. French Sole Ltd.*
(No. CV03-8287 JFW, U.S. Dist. Court, C.D. Calif., April 2008)
After evidentiary hearing, a Federal court in Los Angeles held
UK company in contempt of court for violating an injunction
prohibiting use of client's trademark in advertising and on the
internet.

*McDonald v. Alien Technologies, Inc.*
(AAA Arbitration, San Francisco, Calif., December 2007)
Award on behalf of client suing for severance pay and stock
grant on grounds that company constructively terminated his
employment by materially reducing his duties and authority.

*Doar v. Chiao Smith & Associates.*
(No. CV-05455, Marin Superior Court, June 2006)
Motion for mistrial granted after jury was selected; clients
were investors in Global Money Management, a fraudulent
hedge-fund; case settled after the mistrial.

*Brox v. Peneder*
(No. 26-25972, Napa Superior Ct., May 2006)
Client awarded judgment, including all money damages, in
bench trial in Napa, California; dispute involved real property
in St. Helena and the dissolution of a business partnership that
operated a Napa Valley inn.

*Metabyte, Inc. v. Canal+Technologies, Inc.*
(No. C 02-05509 RMW, U.S. Dist. Court, N.D. Calif., June 2005)
Jury trial in Federal court in San Jose, California representing
high-tech client with claims for breach of "put-option"
contract received after sale of stock to European multi-
national.

*Scott Co. of California v. The Redevelopment Agency of the
City of San Jose*
(No. 90-CV-707494, Santa Clara Superior Ct., Nov., 2004)
Judgment in bench trial for two surety clients in dispute arising
out of the construction of the San Jose Convention Center.

*Levin v. Meagher*
(No. A 10375, California Court of Appeal, July 27, 2004)
Decision addresses grounds for injunction against
presentation of documents for payment on a letter of credit
under California Uniform Commercial Code §5109.

4

*Chapel of the Chimes Napa Valley v. MTO Shahmaghsoudi*
(S116484, Supreme Court of California and A102119,
California Court of Appeal, June 2003)
Successfully opposed petitions in California Court of Appeal
and Supreme Court to review order to disinter body of His
Holiness Hazrat Shah Maghsoudi.

*APJ Associates, Inc. v. North American Philips Corp.*
317 F.3d 610
(Sixth Circuit Court of Appeals, Cincinnati, Ohio, 2003)
Obtained summary judgment for semi-conductor firm in
Federal court in Detroit, Michigan in sales-agent termination
case; affirmed by the Sixth Circuit Court of Appeals.

*Oracle Corp. v. Falotti*
319 F.3d 1106
(Ninth Circuit Court of Appeals, 2003)
Co-counsel for former senior Oracle executive suing to recover
the value of employee stock-options valued in excess of $80
million.

*Scott Co. of California v. United States Fidelity & Guaranty
Insurance Co.*
107 Cal.App.4th 197
(California Court of Appeal, 2003)
Decision addresses whether a surety's liability on a public-
works bond exceeds that of its principal.

*Hamilton & Cleghorn Bar Enterprises v. Brennan & Garlock*
(AAA Arbitration, San Francisco, Calif., February, 2003;
California Court of Appeal, 2004)
Award on behalf of clients suing to recover interests in real-
estate limited partnerships; case was appealed to the
California Court of Appeal.

*The Atchison, Topeka & Santa Fe Railway Co. v. Hercules Inc.*
146 F.3d 1071
(Ninth Circuit Court of Appeals, 1998)
Achieved reversal in the Ninth Circuit Court of Appeals of
District Court order dismissing client's claims for violating
scheduling orders in a related case.

5

*The Atchison, Topeka and Santa Fe Railway Co. v. Brown & Bryant, Inc.*
159 F.3d 358
(Ninth Circuit Court of Appeals, 1997)
Decision by the Ninth Circuit Court of Appeals on the scope of a successor-company's liability for clean-up obligations under the Superfund statute.

*Gerber Radio Supply Co., Inc. v. Philips Semiconductors, Inc.*
(No. 9510934 -EFH, U.S. Dist. Ct., E.D. Mass., 1995)
Jury verdict for client in Federal court in Boston, Massachusetts in sales-agent termination case.

*Liebert Corp. v. North American Philips Corporation*
(No. 66 17 32, Orange County  Superior Ct., 1993)
Advisory jury verdict in product-liability case, leading to settlement for client, North American Philips Corporation.

*American Security Bank, N.A. v. Bank of America NT & SA*
(No. C 90-3313-SBA, U.S. Dist. Court, N.D. Calif.,1993)
Jury trial in Federal court in San Francisco in mortgage-banking case.

*Bandai Co. Ltd. v. Pacific American Corp. v. Bandai Co.*
(No. 89-7241-LEW-Jrx, U.S. Dist. Court, C .D. Calif.,1992)
$26.7 million jury verdict in Federal court in Los Angeles for client suing on contract with a Japanese entertainment company.

*$I^2$, Inc. v. Mepco/Electra, Inc.*
(No. 88-15167, Ninth Circuit Court of Appeals, 1988)
Affirming summary judgment in sales-agent termination case.

| | |
|---|---|
| Lectures and Presentations | "Expert Evidence in the Assessment of Damages" Presented at the International Bar Association Convention. San Francisco, Sept. 2003. |

Address to the National Electrical Manufacturers Representatives Association, "Contract Issues for the Representative"
NEMRA National Convention, Washington, D.C. , March 2003

6

"Conducting an Effective Cross-Examination in California"
Presented at Lorman Education Services seminar.
San Francisco, May 2001

Speaker, Investiture of Thomas A. Balmer as a
Justice of the Supreme Court of Oregon
Salem, Oregon, November 13, 2001

**Professional Organizations and Clubs**

Visiting Committee, 2009 - 2011
The University of Chicago Law School

Member, Board of Directors,
Institute for the Study and Development of
Legal Systems (ISDLS), 2000 – 2012.

Member and General Counsel,
Board of Directors, Magic Theatre, 1998-2003.

Chair, Legal Committee, 2002 - 2004
Member, Board of Directors, 2006 – 2008
Treasurer, 2008
The Olympic Club, San Francisco

President, Cercle de l'Union, 2000 – 2001

**International Legal Reform**

**India, March 2007**
ISDLS Project Director, City Civil Courts Mediation Centre,
High Court of Karnataka, Bangalore.

**India, November 2005**
Advisor, Tis Hazari district court Mediation Center, Delhi.

**India and Bangladesh, April 2002**
Speeches and panel discussions on alternative dispute
resolution in Ahmedabad, India and Dhaka, Bangladesh.

**Malaysia, October 2001**
Speeches and panel discussions on case management and
ADR before Malaysian judicial officers in Kuala Lumpur;
before faculty of the International Islamic University of
Malaysia, Gombak; and before bar associations in Kota
Kinabulu and Kuching, Borneo.

**Bangladesh, April 2000**
Member, ISDLS delegation on judicial reform.  Presentations to Supreme Court judges and members of the Dhaka bar.

**Hong Kong, April 2000**
Panelist appearing before members of the Hong Kong bar association on ADR techniques and case management.

**Pakistan and Bangladesh, October 2000**
Recipient, Speaker's Grant, U.S. Department of State Lectured on ADR and case management at Pakistan College of Law, Lahore, Pakistan, and at judicial training programs in Dhaka and Chittagong, Bangladesh.

**Bangladesh, December 1999**
Member, ISDLS delegation on judicial reform; meetings with judges and members of the Ministry of Law, Law Commission, and Bar Council in Dhaka.

**India, September – October 1996**
Member, American Legal Delegation participating in a national assessment of India's civil justice system.  Lectures and meetings with study groups and bar associations in Chenai, Calcutta, Hyderabad, and Mumbai.

Personal          Born February 19, 1951, in San Francisco, California. Married with three children.

# EXHIBIT Q

**BANCHERO LAW FIRM LLP**
*Anthony Lustig v. AzGen Scientific Holdings PLC*
Civil Action No. 18-cv-07503-HSG

**Attorney and Paralegal Hours**
June 2018 – November 2019

**Initial Representation; Answering AzGen's Letter Terminating Lustig's Employment**
*Anthony C. ("Tony") Lustig retained the Banchero Law Firm in June, 2018. He told us AzGen owed him two months in back-salary and more than $8,000 in unreimbursed travel expenses. A few days after my initial call with Tony, an Irish law firm sent him a letter terminating his employment. The letter claimed Tony was "self-dealing" and, on these grounds, claimed that AzGen owed him nothing for his 1 million + shares of AzGen stock. We interviewed Tony and began reviewing text messages, e-mail messages, and other documents, all of which supported his version of events. AzGen owed him the salary and expenses, and the "self-dealing" allegations were false—a lawyer's pretext for denying Tony payment for the stock. We wrote a letter explaining this to the Irish lawyers,* **Exhibit I.** *It was during this period we confirmed that Tony was an employee under California law and entitled to the protections of the Labor Code.*

| | | | |
|---|---|---|---|
| 6/8/18 | *EJB* | 0.4 | Initial call from Tony Lustig. |
| 6/8/18 | *EJB* | 0.3 | Read AzGen-Lustig employment agreement, emails to and from CEO, and other materials sent by client. |
| 6/12/18 | *EJB* | 0.3 | Read letter from the Irish attorneys, Kennedys, terminating T. Lustig and purporting to claw back his shares of stock in Azgen (.1); call, T. Lustig, to discuss letter and email he will send to P. Gray and whether to copy message to principal investor (.2). |
| 6/14/18 | *EJB* | 0.8 | Meet with T. Lustig; we discuss facts, AzGen business he conducted; C.Corp and its CEO, M. Spio; response to Kennedys' letter. |
| 6/15/18 | *MBB* | 1.8 | Research regarding penalties for late payment of wages; distinction between an employee and an independent contractor; right to attorney's fees; locate citations for letter to Kennedys; revise letter. |
| 6/15/18 | *EJB* | 3.3 | Email messages from T. Lustig summarizing salary due for April/May, 2018, and unreimbursed business expenses (.5); call, T. Lustig, to discuss response to termination letter (.4); revise letter to Kennedys (1.8); email messages and telephone calls with T. Lustig re: monthly invoices he submitted to AzGen, and other facts required for letter (.6). |
| 6/16/18 | *EJB* | 0.7 | Email and text messages from T. Lustig, and original Letter of Offer; review, and revise letter to Kennedys. |
| 6/18/18 | *EJB* | 0.3 | Final revisions to letter to Kennedys; email messages, call, T. Lustig re: final revisions. |

| 6/19/18 | *EJB* | 0.3 | Email to T. Lustig in response to his questions re: sending Kennedys letter and response to C.Corp CEO Mary Spio (.2); further message from T. Lustig, forwarding message from C.Corp's M. Spio (.1). |
| 6/27/18 | *EJB* | 0.1 | Email from T. Lustig enclosing draft message to AzGen investor; call, T. Lustig, with comments on message. |
| 7/2/18 | *EJB* | 0.2 | Call, voicemail, to attorney James Brown, representing AzGen (.1); text from T. Lustig and reply re: C.Corp CEO's refusal to deal with AzGen until dispute is resolved (.1). |
| 7/19/18 | *EJB* | 0.4 | Call, AzGen lawyer Brown; he states AzGen is claiming Tony was self-dealing, but admits his information is limited; we discuss my sending him emails and texts to refute allegation (.2); call, T. Lustig, to report on call with Brown (.2). |
| 7/26/18 | *EJB* | 1.6 | Read C.Corp - AzGen SPV Operating Agreement; email and text messages between client and P. Gray; and related travel receipts (1.4); begin outlining response to AzGen lawyer to rebut self-dealing allegation (.1); calls, voicemail, to T. Lustig. (.1) |
| 8/6/18 | *EJB* | 0.3 | Call, T. Lustig; we discuss my review of texts and e-mail messages to Paul Gray. |
| 8/7/18 | *EJB* | 0.3 | Call, T. Lustig re: shares of stock in AzGen; valuation, planned liquidity events; cap table; other shareholders. |
| 8/8/18 | *EJB* | 0.5 | Read *Dynamex* decision and related memorandum re: independent contractor/employee distinction. |
| 8/9/18 | *EJB* | 3.8 | Research independent contractor/employee test, for purposes of claiming attorneys' fees under Labor Code sec. 218.5; read *Borello, Martinez* and related decisional law, including decisions from the federal district courts in California. |
| 8/10/18 | *EJB* | 2.4 | Outline elements proving that T. Lustig is an AzGen employee, using *Dynamex* and *Borello* factors (1.3); go through file, reviewing original August 1, 2017, agreement, December 27, 2017 agreement, notes on Tony's work and business relationship with AzGen, and related correspondence (1.1). |

**Filing the Complaint and Serving Process; Preserving Key Evidence**

*Although AzGen's founder and principal, Paul Gray, is a U.S. citizen and apparent U.S. resident, AzGen was organized under the laws of Ireland and had its principal place of business in Dublin. In September, 2018, it became clear that Tony would have to file suit to recover what he was owed. We began drafting the complaint. We prepared to serve the complaint under the rules of the Hague Convention, which are somewhat complex. We spent time locating an Irish solicitor to advise us. We also spent time preserving key evidence from AzGen's website, the videos "We Know the Way" and "AzGen Energy Statistics". We filed a First Amended*

*Complaint and sent the complaint to Kennedys, AzGen's Irish law firm, with a form for Waiver of Service of the Summons and Complaint. The e-mail bounced back, so we took steps to serve the complaint under the Hague Convention, which included preparing a letter for, and working with, the Court's clerk. On January 23, 2018, a partner in the San Francisco offices of Duane Morris LLP executed the Waiver of Service.*

| 9/12/18 | *EJB* | 3.9 | Review AzGen's corporate information from Irish database to determine names of agents, directors, and address for service of process (.2); research rules for service of complaint on foreign corporation, including Articles 5, 10 of the Hague Convention; US Supreme Court authority (*Watersplash v. Menon*), and 9th Circ. and N.D. Cal. federal court rules and decisions (3.5); outline procedures for service of complaint; email to lawyer colleagues seeking referral of Dublin-based solicitor to effect service on AzGen (.2). |
| 11/2/18 | *EJB* | 3.9 | Review T. Lustig-Paul Gray correspondence, Lustig invoices to AzGen, and related factual materials for draft complaint (2.4); begin drafting complaint, including jurisdiction and venue allegations (.9); email to T. Lustig with questions on certain factual allegations needed for complaint (.6). |
| 11/6/18 | *EJB* | 0.3 | Email to T. Lustig with fact questions for complaint, including current status of C.Corp and whether P. Gray has communicated further; Mary Spio of C.Corp; and venue issues. |
| 11/14/18 | *EJB* | 1.1 | Work on draft complaint (.4); emails to T. Lustig with fact questions for complaint (.7) |
| 11/16/18 | *EJB* | 2.5 | Email to T. Lustig re: AzGen videos and forensic preservation for those links (.1); write general allegations section for complaint (2.4) |
| 11/18/18 | *EJB* | 3.7 | Work on complaint, including causes of action for waiting time penalties, and breach of contract (2.8); research on implied covenant allegations, and tort for wrongful discharge for violation of public policy (.9). |
| 11/19/18 | *EJB* | 4.7 | Finish first draft of complaint, including research and draft cause of action for wrongful discharge, waiting time penalties, and breach of contract; revise draft. |
| 11/20/18 | *MB* | 0.7 | Proofread and cite-check complaint. |
| 11/26/18 | *EJB* | 1.3 | Read revisions to complaint suggested by T. Lustig (.2); email messages from May, 2018 concerning Tony's potential work with C.Corp (.4); further emails and responses from client regarding complaint (.7) |
| 11/26/18 | *MB* | 0.3 | Telephone call with computer consultant re: preserving AzGen videos posted on Vimeo; email to J. Banchero. |

| 11/27/18 | *EJB* | 0.4 | Outline agenda for 11/28 meeting with client, to go over allegations in complaint, including fourth cause of action for wrongful discharge. |
| 11/28/18 | *EJB* | 2.8 | Meet with T. Lustig to go over draft complaint -- expense amounts, value of AzGen stock, his communications with P. Gray demanding payment for April-May time, and wrongful discharge (2.2); write notes to file memorializing interview (.6). |
| 11/29/18 | *EJB* | 0.9 | Further email message re: allegations in the complaint concerning stock certificates (.2); revise complaint, and send further draft to T. Lustig (.7) |
| 12/4/18 | *EJB* | 2.6 | Email from T. Lustig re: cause of action for wrongful discharge, and possible fraud/misrepresentation claims (.1); reply, explaining claims and facts in support of these claims (.6); final revisions to complaint (.3); research, Hague Convention terms and confirm availability of service by mail on foreign corporation under Federal Rules (.7); letter to Susan Yoong, ND Court Clerk, requesting that the Court send complaint, summons, and related materials to AzGen at its Ireland address, and to confirm service (.9). |
| 12/5/18 | *EJB* | 2.3 | Email from T. Lustig, with further comment on factual allegations in complaint, and discussing L. Siemens and L. Carter, and their roles at AzGen (.2); reply to T. Lustig's message, commenting on fraud/misrepresentation facts (.4); work on complaint, including revisions to non-payment of wages cause of action, adding stock payments due to this claim (1.2); work on letter to Northern District Court Clerk and service issues (.5) |
| 12/5/18 | *MB* | 0.6 | Research filing procedures, court rules for Northern District. |
| 12/6/18 | *EJB* | 0.4 | Email from T. Lustig explaining AzGen's structure, names of employees, and corporate offices in Dublin, and reply (.2); revise complaint (.2). |
| 12/7/18 | *EJB* | 0.4 | Revise complaint. |
| 12/12/18 | *EJB* | 0.6 | Final revisions to draft complaint (.5); send draft to T. Lustig, with comment, for final review before filing. (.1) |
| 12/13/18 | *MB* | 0.8 | Research local rules and Judge's standing orders; calendar deadlines. |
| 12/14/18 | *MB* | 0.8 | Review Order Setting Case Management Conference and calendar additional deadlines (.3); compile documents required to be served on defendant per court order, court website, and local rules (.5). |
| 12/17/18 | *EJB* | 0.3 | Call, James Brown, AzGen lawyer, to discuss AzGen's obligation to pay Lustig's salary and other compensation (.1); call, T. Lustig, to report on call (.1); go over materials from Court for service with summons (.1). |

| 12/18/18 | *MBB* | 2.2 | Research recent case law interpreting *Dynamex* decision. |
|---|---|---|---|
| 12/19/18 | *EJB* | 0.1 | Email message to J. Brown, requesting payment and status of his law firm's representation. |
| 12/21/18 | *MB* | 0.3 | Prepare and file Declination of Magistrate Judge form. |
| 12/27/18 | *MB* | 0.6 | Review court order assigning Judge Haywood S. Gilliam, Jr.; download and review judge's standing orders; calendar new case management conference date and related deadlines. |
| 1/3/19 | *MB* | 1.0 | Prepare Notice & Waiver of Service forms; compile packet of documents to be served on defendant; review filing procedures for Oakland court (.8); research rules for demanding jury trial (.2). |
| 1/3/19 | *EJB* | 0.7 | Revise complaint to add jury demand at end of pleading, and check local rules for other pleading requirements (.4); letter to J. Brown, requesting that he confirm his representation of AzGen (.3) |
| 1/7/19 | *EJB* | 0.8 | Email from T. Lustig and reply re: text messages and phone call with Mary Spio of C.Corp, in which I advise Tony on Mary's role as a witness in the case, and discovery issues with respect to his communicating with her (.5); work on first amended complaint (.3) |
| 1/9/19 | *EJB* | 1.5 | Revise complaint, completing First Amended Complaint, including revisions to jurisdiction section and jury demand (1.1); letter to M. Walshe of Kennedys, Dublin, Ireland, enclosing complaint and form for waiver of service of summons (.4) |
| 1/10/19 | *EJB* | 0.4 | Letter to M. Walshe and cover e-mail message (.2); e-mail messages to lawyers at the Kennedys Dublin, Ireland office when the Walshe e-mail bounces back, enclosing summons, complaint, and related case materials (.2). |
| 1/11/19 | *EJB* | 0.5 | Revise draft letter to court clerk requesting service of process under the Hague Convention (.2); calls, B. McFarlane and voicemail to Brian Pedersen, regarding Neil Beaton and Brian as potential experts in the case (.3). |
| 1/14/19 | *EJB* | 0.6 | Email message to T. Lustig re Q.Corp and AzGen's investment in Q.Corp (.5); email message from Court describing service requirements for foreign corporation (.1) |
| 1/14/19 | *MB* | 0.3 | Call, email to court clerk re procedure for having clerk serve Summons and Complaint by mail. |
| 1/18/19 | *EJB* | 1.2 | Draft declaration for court clerk Jordan Burgan for service of summons and complaint by mail (.8); go over exhibits to declaration and procedures for sending (.4). |
| 1/18/19 | *MB* | 0.5 | Research mail options for mail to Ireland with return receipt; revise declaration of J. Burgan; email J. Burgan with declaration. |

| 1/18/19 | MBB | 0.5 | Research on mailing with return receipt; proof of service of summons and complaint under Fed. Rule Civ. Proc. 4(f). |
| 1/22/19 | EJB | 0.7 | Email from T. Lustig and reply re: AzGen's corporate restriction for non-filing of 2018 statement in Ireland (.2); call, T. Lustig to discuss his research on AzGen's corporate status (.2); email message and receipt of Waiver of Service of Summons from J. Brown, Duane Morris lawyer (.1); call, to report on waiver, to T. Lustig (.2). |
| 1/22/19 | MB | 0.7 | Online research re "strike-off" of AzGen Plc; download forms and information (.5); calendar deadlines triggered by Waiver of Service (2.) |

## Drafting the Motion for Anti-Suit Injunction

*Because we sent the waiver form to the Irish attorneys, AzGen had 90 days—until late April, 2019—to respond to the complaint. On the first day of this 90-day period, I received a letter from Irish lawyers reiterating AzGen's refusal to pay Tony any amount whatsoever. Now, however, the lawyers demanded that Tony pay hundreds of thousands of dollars in damages and, on AzGen's behalf, threatened to file suit against Tony in Dublin. (Exhibit K.) An individual in Tony's position could not easily defend himself in a foreign court, and such a lawsuit would threaten this Court's jurisdiction to adjudicate Tony's claims. We drafted a motion for anti-suit injunction, which, under well-established Ninth Circuit authority, Tony would be entitled to. We were prepared to file the motion in this Court immediately upon notice that AzGen had sued Tony in Dublin. Despite the threat, AzGen did not file suit, so we did not file the motion. The anti-suit injunction required Tony to demonstrate that this Court has personal jurisdiction over AzGen. We used the jurisdictional facts and decisional law in the draft motion in the instant motion for entry of default judgment.*

| 1/23/19 | EJB | 3.0 | Letter from Irish lawyers OCWM Law, threatening to file law suit in Dublin, Ireland against T. Lustig (.3); research grounds for injunction to prohibit AzGen from proceeding against client in Ireland (.5); call, T. Lustig to discuss lawyer's letter and issues it raises: jurisdiction in Ireland, forum non conveniens, and exposure in damages for alleged breach of duty (.8); research, begin outlining motion for anti-suit injunction (1.4). |
| 1/24/19 | EJB | 5.1 | Call, T. Lustig, to discuss Q.Corp and C.Corp work, for purposes of jurisdiction facts (.3); work on anti-suit injunction motion, including research on Circuit cases, and the *Gallo* decision and its progeny (4.6); further call and email from T. Lustig re: Q.Corp and C.Corp headquarters in Calif. (.2). |
| 1/24/19 | MBB | 3.3 | Research additional case law supporting anti-suit injunction. |
| 1/25/19 | EJB | 3.5 | Work on anti-suit injunction law section--complete first draft (2.7); call, F. Hainline to discuss referral of Irish lawyer (.1); calls, T. |

|        |     |     | Lustig to go over facts that support jurisdiction (.4); and emails from Tony re his contacts with C.Corp and Paul Gray's text messages concerning work in California (.3). |
|--------|-----|-----|-----|
| 1/25/19 | *MBB* | 4.5 | Research on personal jurisdiction decisional law for anti-suit injunction. |
| 1/26/19 | *EJB* | 1.5 | Revise anti-suit injunction brief -- legal authorities on anti-suit injunctions (.8); work on jurisdiction section (4); call, T. Lustig. (.3) |
| 1/26/19 | *MBB* | 6.6 | Further research; draft section re personal jurisdiction for anti-suit injunction. |
| 1/27/19 | *EJB* | 3.8 | Revise law section, anti-suit injunction (.3); draft, and revise, Decl. of Tony Lustig in support of motion--review recent messages, texts, between Paul Gray and Tony Lustig (3.4); email enclosing draft declaration to T. Lustig, with comment (.1). |
| 2/7/19 | *EJB* | 1.2 | Email messages from T. Lustig with information for declaration in support of anti-suit injunction (.3); revise declaration and send, with comment, to T. Lustig. (.9) |
| 2/8/19 | *MB* | 1.2 | Review emails from client and organize evidentiary files of texts and emails. |
| 2/10/19 | *EJB* | 2.9 | Revise anti-suit injunction law section (.4); draft letter to Brendan Frawley, OCWM Dublin lawyer, in response to his letter of January 23, and revise letter (2.4); e-mail message to T. Lustig enclosing letter (.1). |
| 2/10/19 | *MBB* | 3.4 | Further research to support anti-suit injunction (1.3); research on personal jurisdiction; employment context (1.0); revise letter to AzGen attorneys (1.1). |
| 2/11/19 | *EJB* | 2.0 | Call, T. Lustig re: declaration in support of anti-suit injunction (.2); revise response letter to OCWM lawyers (.7); notice of motion, proposed order, and revise memorandum, anti-suit injunction (1.1). |
| 2/11/19 | *MBB* | 1.9 | Further research on personal jurisdiction and revise jurisdiction section of motion for antisuit injunction. |
| 2/12/19 | *EJB* | 3.7 | Call, T. Lustig to get his comments on draft letter to Irish lawyers, OCWM (.3); work on motion for anti-suit injunction, law section and T. Lustig declaration (3.4) |
| 2/13/19 | *EJB* | 4.1 | Initial call with Dublin, Ireland lawyer Ronan Hynes; we discuss Lustig's federal court lawsuit, OCWM's threat to sue Tony in the High Court of Dublin, timing, procedures in the Irish courts, and terms of representation (.6); work on anti-injunction brief (*Unterweser* factors, Statement of Facts) (3.5). |
| 2/14/19 | *EJB* | 5 | Work on bond section, and *Unterweser* factors, motion for anti-suit injunction (1.6); revise statement of facts and legal standard for |

|        |     |     | motion (2.7); work on CMC deadlines and discovery plan (.4); revise Lustig declaration (.3). |
|--------|-----|-----|---------------------------------------------------------------|
| 2/14/19 | MB | 0.5 | Online research re preservation of text messages; email to client re: providing his texts and emails related to issues in the lawsuit. |
| 2/15/19 | EJB | 2.1 | Draft introduction and revise legal section of anti-suit injunction brief (1.4); call, T. Lustig to discuss C.Corp, Paul Gray, Luis Siemens and statements leading to termination of employment relationship (.7). |
| 2/15/19 | MB | 0.7 | Telephone call with client and J. Banchero re obtaining emails, texts, other documents (.5); check status of AzGen on Ireland website (.2) |
| 2/16/19 | EJB | 2.6 | Revise brief for anti-suit injunction (2.3); email messages with T. Lustig re: AzGen board member Jim Cain and settlement (.3) |
| 2/19/19 | EJB | 1.3 | Call, T. Lustig to discuss L. Siemens threats, J. Cain, possible settlement text message to P. Gray (.5); revise Lustig declaration and brief revisions to memorandum brief, motion for anti-suit injunction (.8) |
| 2/19/19 | MB | 0.4 | Update calendar (.2); set up Dropbox file for documents; emails with client (.2). |
| 2/20/19 | EJB | 0.9 | Letter to J. Brown re: Rule 26 meet and confer deadlines for Case Management Conference, scheduled for March 26 (.6); work with M. Banchero on T. Lustig documents for disclosure under Rule 26 (.3). |
| 2/20/19 | EJB | 1.5 | Revise memorandum in support of motion for anti-suit injunction. |
| 2/20/19 | MB | 1.0 | Emails with client re: documents; attempt to access Outlook .pst files uploaded by client; brief review of other documents sent. |
| 2/22/19 | EJB | 1.8 | Revise introduction and "same issues/same parties" section, adding *Seattle Totems* argument. |
| 2/26/19 | EJB | 0.6 | Call, T. Lustig re: interview with Mary Spio and potential settlement demand to AzGen (.3); email messages with T. Lustig about CMC conference and March 5 deadline to meet and confer with opposing counsel, and settlement procedures (.3). |
| 2/27/19 | EJB | 0.2 | Email messages and reply, T. Lustig, re P. Gray and L. Siemens. |

**Drafting the Case Management Conference Statement, Initial Disclosures under Rule 26, and Serving Interrogatories and Requests for Admission; Duane Morris Moves to Withdraw as AzGen's Counsel**

*Initial deadlines in the case were approaching, including dates for filing a Case Management Conference Statement and initial disclosure under Rule 26. These required us to investigate and settle on witnesses, key documents, and damages calculations. Duane Morris gave notice that the firm was moving to withdraw. I was asked to stipulate to extending the CMC conference, which I agreed to and the Court entered. We did not oppose the motion to withdraw, but we did file an opposition paper recommending that Duane Morris continue to serve papers on AzGen pursuant to the Local Rules. Because the value of Tony's AzGen stock is an element of damages, we served written discovery to elicit financial information from AzGen relating to its finances and capitalization. Prior to Duane Morris's withdrawal, the parties engaged in settlement discussions.*

| 3/4/19 | *EJB* | 1.4 | Call, T. Lustig to discuss meet-and-confer deadlines with opposing counsel, and CMC statement (.2); call, James Brown, to discuss CMC and possible resolution of dispute (.3); call, T. Lustig, to report on call with Brown (.4); emails from T. Lustig between him and M. Spio of C.Corp and call to discuss (.5). |
|---|---|---|---|
| 3/5/19 | *EJB* | 0.9 | Call, J. Brown, AzGen counsel; he informs me that he is moving to withdraw; he raises settlement (.4); call, to report on J. Brown call, with T. Lustig (.5). |
| 3/6/19 | *EJB* | 3.0 | Research on Calif. statutes providing for personal liability for officers and directors of company owing wages to employee, and lien law, as it may apply to AzGen's investments in C.Corp and Q.Corp Corp. (1.8); email messages with T. Lustig re: AzGen's settlement offer, and procedural steps (1.0); further email message from J. Brown, requesting stipulation for CMC and related deadlines (.2). |
| 3/7/19 | *EJB* | 0.7 | Call, T. Lustig, to discuss his telephone call with Mary Spio -- value of C.Corp tokens, conversations with Gray re: Tony's work, and his call with Q.Corp Corp. CEO (.4); emails with J. Brown and associate re: motion to withdraw as counsel, scheduling date for CMC with Judge Gilliam (.3). |
| 3/8/19 | *EJB* | 0.4 | Emails with T. Lustig re: M. Spio, and facts in defense of self-dealing allegations (.2); emails with J. Brown's associate re: stipulation for extension of CMC. (.2) |
| 3/11/19 | *EJB* | 0.5 | Notes to file on T. Lustig's conversations with Q.Corp CEO and Mary Spio (.3); call, T. Lustig to report on AzGen lawyers' administrative motion to extend CMC conference (.2). |
| 3/12/19 | *EJB* | 1.3 | Receive stipulation extending CMC from Duane Morris, review and revise, to correct dates for discovery disclosures (.6); email to |

| | | | |
|---|---|---|---|
| | | | Duane Morris paralegal enclosing revisions, and further calls with associate to confirm stipulation, and sign (.7) |
| 3/13/19 | *EJB* | 5.1 | Receive service of Duane Morris LLP administrative motion to withdraw as AzGen's counsel, and review (.4); outline response to statement, and research Local Rules and related authorities, draft response, Decl. of T. Lustig and Decl. of E. Banchero, and Proposed Order (4.5): email to client, with comments and fact question re: declaration (.2). |
| 3/14/19 | *EJB* | 0.9 | Revise opposition statement to Duane Morris's administrative motion to withdraw (.6); emails with T. Lustig re: his declaration (.3) |
| 3/15/19 | *EJB* | 1.3 | Final revisions to opposition/response to administrative motion re: Duane Morris withdrawal (.8); calls, court clerk and James Brown, email messages, re: conflict for hearing date, possible attendance by telephone (.5) |
| 3/17/19 | *EJB* | 0.4 | Draft request for telephone conference or continuance re: Administrative Motion to withdraw. |
| 3/18/19 | *EJB* | 0.8 | Email from Court deputy requesting motion and proposed order re: Administrative hearing; prepare order and revise motion (.4); reply brief on Administrative motion (.1); emails with T. Lustig re C.Corp and Mary Spio, reply (.3) |
| 3/19/19 | *EJB* | 0.2 | Email from T. Lustig re: latest message from C.Corp CEO Mary Spio re: investment. |
| 3/20/19 | *EJB* | 0.2 | Email from T. Lustig and reply re: conversation with Q.Corp CEO re: AzGen's investment and AzGen's plans. |
| 3/21/19 | *EJB* | 0.8 | Attend hearing, by telephone, on Duane Morris LLP's motion to withdraw (.4); notes to file (.1); call with T. Lustig to report on hearing (.1); call, email with T. Lustig re: T. Elfmont, detective/asset search for AzGen (.2). |
| 3/26/19 | *MB* | 0.6 | Organize recently-filed pleadings (.3); update calendar deadlines (.3). |
| 3/26/19 | *EJB* | 0.8 | Complete ADR certification form and send to client; go over ADR packet (.2); attention to current court deadlines--initial disclosures, discovery plan, and CMC statement (.5); email from J. Brown re time for default and service issues (.1) |
| 3/27/19 | *EJB* | 3.5 | Work on initial disclosures: witnesses, documents, and damages calculations (1.7); begin drafting requests for documents and interrogatories (1.5); call, T. Lustig re ADR and ADR certification (.2); further call, T. Lustig, re: KG Charles at Q.Corp Corp. (.1). |
| 3/28/19 | *EJB* | 0.9 | Call, T. Lustig re: Q.Corp CEO, ADR Certification, possible settlement approach with P. Gray (.6); call, J. Brown re: settlement |

| | | | |
|---|---|---|---|
| | | | (.1); call, to report on J. Brown call and possible Paul Gray-T. Lustig negotiation, with T. Lustig (.2). |
| 3/29/19 | *EJB* | 4.3 | Work on initial disclosures: witnesses, documents, damages calculations (2.1); go through fact memoranda and email messages from client to outline facts for default judgment (1.3); attention to ADR form and service on Duane Morris LLP for forwarding to AzGen (.2); research attachment/claim and delivery/turnover orders/appointment of receiver to secure judgment, and pre-judgment remedies generally (.7). |
| 3/29/19 | *MB* | 0.3 | Revise ADR Certification; file and serve. |
| 4/1/19 | *EJB* | 1.7 | Research on pre-judgment attachment and liens, turnover orders, assignment orders re: AzGen's investments in Q.Corp and C.Corp (1.1); notes to file (.2); call, J. Brown re: settlement (.1); call, email messages, T. Lustig re Brown, Paul Gray, and settlement (.3). |
| 4/2/19 | *EJB* | 1.7 | Work on attachment/execution outline, and research CCP attachments statute and California authorities on levy re: stock certificates and interests in companies. |
| 4/3/19 | *EJB* | 1.6 | Emails with T. Lustig, and calls, re text message from M. Spio phone (hacking/tapping phones); draft responses to Spio (.5); work on initial disclosures (.5); work on requests for production of documents: AzGen financial statements, balance sheets and other corporate information to determine stock value (.6). |
| 4/8/19 | *EJB* | 3.7 | Draft Case Management Statement (2.9); draft interrogatories and requests for admissions (.4); call, T. Lustig re: damages calculations for initial disclosures and CMC statement (.2); email from T. Lustig enclosing names of AzGen shareholders for disclosure pursuant to local court rule (.2). |
| 4/9/19 | *MB* | 0.6 | Review and revise draft Case Management Statement and discovery. |
| 4/9/19 | *EJB* | 4.4 | Draft declaration of E. Jeffrey Banchero in connection with plaintiff's Case Management Statement (.4); draft Certificate of Interested Parties or Entities (.3); revise initial disclosures (.7); calls, T. Lustig, re: facts for initial disclosures and Case Management Statement, including damages calculations (.4); revise Case Management Statement (2.6). |
| 4/12/19 | *EJB* | 2.3 | Revise draft request for production of documents and send to client (.4); call, T. Lustig to discuss terms of document request (.3); email to R. Hynes, Irish counsel, re AzGen "strike off" and personal service under the Hague Convention (.6); draft interrogatories re: value of T. Lustig AzGen shares (.6); continue preparing attachment papers for levy on C.Corp and Q.Corp investments (.4). |

| 4/15/19 | *EJB* | 2.4 | Revise interrogatories (1.1); revise request for documents, including email from T. Lustig and revisions to first draft re: valuation documents (1.3). |
| 4/15/19 | *MBB* | 0.5 | Review and revise interrogatories and request for documents. |
| 4/16/19 | *EJB* | 2.5 | Call, from T. Lustig re: AzGen's Jim Cain (.2); final revisions to requests for admission and interrogatories, and emails re: same with T. Lustig (.3); travel to Oakland for Case Management Conference (.7); attend conference before Judge Gilliam (.6); travel to San Francisco (.7). |
| 4/16/19 | *MB* | 0.2 | Calendar deadlines for discovery. |

**Clerk's Entry of Default; Discovery on the Value of AzGen's Investments in C.Corp. and Q.Corp.**

*AzGen did not replace Duane Morris. The date set by the Court for AzGen to respond to the complaint passed. We filed an application with the court clerk for entry of default, which was granted. We began drafting the motion for entry of default judgment. Because AzGen did not respond to the written discovery concerning its finances, we took steps to value AzGen's investments in two California companies—Q.Corp and C.Corp. We wrote letters to, and served subpoenas on, each company and attempted to work with lawyers for the companies to obtain declarations in lieu of deposition testimony. Because Q.Corp considered the information sensitive, its lawyer requested that we obtain a protective order from the Court. Because AzGen was unrepresented, I could not obtain the protective order by stipulation, so I filed a motion, which the Court granted. The subpoenas, and the work with lawyers for Q.Corp and C.Corp in connection with the subpoenas, took longer to accomplish than expected. We offered to accept declarations in lieu of deposition testimony. The lawyers for the companies were at times cooperative, and seemed interested, but at the deadline for filing this motion, they had not provided declarations from their clients. It was during this period that the Court held a hearing to modify its order with respect to service of papers on AzGen through Duane Morris, its former counsel.*

| 4/18/19 | *EJB* | 0.9 | Work on request to court clerk to enter default, and timing for request (.5); outline application to Court for default judgment (.4). |
| 4/19/19 | *EJB* | 2.3 | Research re: entry of default and default judgment (.6); email message to J. Brown re: entry of default on April 23 (.1); draft Request for Entry of Default and supporting declarations of E. J. Banchero and T. Lustig (1.6) |
| 4/23/19 | *EJB* | 1.1 | Work on request to enter default by clerk, including Banchero declaration and request, and call, T. Lustig re: his declaration (.4); work on motion for default judgment: outline memorandum in support, and read default-judgment cases decided by Northern District judge. (.7). |

| 4/24/19 | *EJB* | 0.2 | Receive order re: default from court clerk; email to client, with explanation. |
| 4/25/19 | *MBB* | 5.8 | Research and begin drafting motion for entry of default judgment. |
| 4/26/19 | *MBB* | 3.5 | Work on motion for entry of default judgment. |
| 4/26/19 | *EJB* | 0.2 | Email to R. Hynes, Irish lawyer, re legal questions, including service of process under the Hague Convention and AzGen's responsibility to creditors under Irish law; suggest time for telephone call. |
| 5/2/19 | *EJB* | 2.4 | Research on standard to prove damages; read Ninth Circuit decisional law and write summary memorandum for use in motion for default judgment (1.7); call, R. Hynes, Irish attorney re: service on de-listed corporation and other issues for default against AzGen (.6); notes to file (.1). |
| 5/2/19 | *MB* | 1.0 | Create screenshot record of AzGen website. |
| 5/3/19 | *EJB* | 0.8 | Call, T. Lustig re Q.Corp investment and his discussions with Q.Corp CEO (.5); work on motion for entry of default judgment (.3). |
| 5/6/19 | *MBB* | 1.1 | Revise motion for entry of default judgment. |
| 5/7/19 | *MBB* | 2.2 | Revise motion for entry of default judgment. |
| 5/8/19 | *EJB* | 0.4 | Email and reply, J. Brown, re: Duane Morris's obligation to accept service of documents for AzGen, and court's recent minute order. |
| 5/16/19 | *MBB* | 1 | Revise motion for entry of default judgment. |
| 5/20/19 | *EJB* | 0.1 | Email and reply re: subpoena of Q.Corp, and T. Lustig's conversations with Q.Corp CEO. |
| 5/23/19 | *EJB* | 0.1 | Email and reply re: subpoena to Q.Corp. |
| 6/3/19 | *EJB* | 1.9 | Call, J. O'Connor, to discuss using him as an expert witness re: attorneys' fees on motion for entry of default judgment (.4); research re: subpoena duces tecum to Q.Corp and C.Corp, and outline document requests and topics for deposition (1.5). |
| 6/4/19 | *EJB* | 1.1 | Work on subpoena duces tecum, notice of deposition, and cover letter to Q.Corp; send, with comment, to T. Lustig. |
| 6/5/19 | *EJB* | 0.4 | Email from T. Lustig re Q.Corp Corp. deposition and reply (.2); final revisions to letter, subpoena, and notice of deposition (.2) |
| 6/7/19 | *EJB* | 0.8 | Email message from R. Dharnidharka, DLA Piper lawyer representing Q.Corp Corp, re: subpoena duces tecum (.1); call, Dharnidharka to discuss subpoena (.3); emails to T. Lustig re subpoena and next steps, and follow-up call on same subjects (.4). |

| | | | |
|---|---|---|---|
| 6/10/19 | *EJB* | 0.8 | Work on subpoena to C.Corp and Q.Corp, and outline administrative motion re: protective order (.6); email messages with T. Lustig re Q.Corp attorney and interaction with Q.Corp CEO (.2). |
| 6/10/19 | *MBB* | 1.2 | Research: re stipulated protective orders; confidentiality agreements; service of subpoena on corporation; service where agent for service of process is a Mailboxes address. |
| 6/17/19 | *EJB* | 3.6 | Draft administrative motion for protective order and supporting declaration of J. Banchero. |
| 6/19/19 | *EJB* | 0.2 | Revise motion for protective order. |
| 7/19/19 | *EJB* | 0.3 | Call, James Brown re: Judge Gilliam's request for telephone hearing on service on AzGen and motion for protective order. |
| 7/22/19 | *EJB* | 0.7 | Draft stipulation re telephonic conference with the Court, rescheduling the conference from 7/24 to 7/25, as directed by the courtroom deputy; send to J. Brown, former AzGen counsel (.7). |
| 7/23/19 | *MB* | 0.2 | Research re: current status of AzGen as Irish corporation. |
| 7/23/19 | *MBB* | 1.1 | Research re: effect of inability to serve defendant; service of motion for default judgment on defendant who has not made an appearance. |
| 7/23/19 | *EJB* | 3.1 | Draft statement for Court in connection with 7/24 telephonic conference re: motion for protective order, and Duane Morris's request to be relieved of service obligation (2.9); calls, email messages with T. Lustig re his call to Paul Gray, and whether we use this fact in support of our statement (.2). |
| 7/29/19 | *EJB* | 0.2 | Work on subpoenas duces tecum to Q.Corp and C.Corp. |
| 8/1/19 | *MBB* | 0.6 | Research re: requirement of service on defendant who has not appeared to defend action. |
| 8/2/19 | *MBB* | 1.1 | Research re service of papers on defendant who has not appeared; challenges to default judgment for "good cause"; excusable neglect. |
| 8/7/19 | *MB* | 1.7 | Draft letters to Q.Corp attorney and M. Spio re deposition subpoenas; prepare draft subpoenas; research address for Q.Corp; business searches on Secretary of State website; phone call, Berkeley process server. |
| 8/9/19 | *EJB* | 0.9 | Revise letters and subpoenas to Q.Corp (.4) and C.Corp (.3); call, T. Lustig (.2). |
| 8/12/19 | *EJB* | 0.4 | Calls, T. Lustig to discuss subpoenas to Q.Corp and C.Corp. |
| 8/28/19 | *EJB* | 1.7 | Work on subpoenas to Q.Corp and C.Corp; letter to Q.Corp attorney and to Mary Spio (1.6); call, T. Lustig (.1). |
| 9/3/19 | *EJB* | 1.5 | Work on subpoena duces tecum to Q.Corp, and revise letter to Q.Corp attorney re: subpoena (1.0); letter to Mary Spio of C.Corp, and work on language for C.Corp subpoena (.5). |

| 9/4/19 | *EJB* | 0.3 | Revise, send letter to Mary Spio re: request for information and documents from C.Corp. |
|---|---|---|---|
| 9/5/19 | *EJB* | 0.3 | Revise letter to Q.Corp lawyer, and send re: subpoena duces tecum. |
| 9/17/19 | *EJB* | 0.3 | Call, DLA Piper lawyer S. Newland re: Subpoena duces tecum to Q.Corp (.2); call, to report on status of Q.Corp subpoena, with T. Lustig (.1) |
| 9/18/19 | *EJB* | 0.2 | Email messages from T. Lustig and reply re: Mary Spio and request for damages-related documents from C.Corp. |
| 9/20/19 | *EJB* | 0.2 | Email from Q.Corp attorney Sean Newland and reply, re: Deposition of Q.Corp on Sept. 26 and declaration in lieu of deposition. |
| 9/30/19 | *EJB* | 0.5 | Call, S. Newland, lawyer for Q.Corp re: draft declaration by KG Charles, Q.Corp CEO; we agree to extend deposition to October 10 (.3); email and reply, T. Lustig, re: C.Corp and Mary Spio (.2). |
| 10/2/19 | *EJB* | 0.6 | Emails from T. Lustig re: C.Corp and Mary Spio; message to Mary Spio enclosing 9/4 letter and reiterating Tony's need for information from C.Corp; forward message to Tony (.4); Spio responds, putting us in touch with C.Corp's lawyers at Morrison & Foerster; email to Tony re: Spio's response (.2). |
| 10/11/19 | *EJB* | 1.0 | Call, voicemail to Murray Indick, C.Corp lawyer (.1); message to Sean Newland, Q.Corp lawyer (.1); write status report for Judge Gilliam, Jr., and file report re: motion for default judgment (.8). |
| 10/16/19 | *EJB* | 1.5 | Email message to Irish attorney T. Gorry re: AzGen's registration as Irish corporation, its strike-off, and service of process in Ireland (.3); email messages with C.Corp attorney M. Indick (.2); review Q.Corp and C.Corp investments and notes and other documents re: AzGen's other assets. (1.0) |
| 10/19/19 | *EJB* | 1 | Call, Murray Indick, C.Corp lawyer re: request for information from Mary Spio and C.Corp re: AzGen's convertible investment (.3); email to T. Lustig and reply re C.Corp (.1); research on service of subpoena on DE corporation (.6) |
| 10/21/19 | *EJB* | 0.4 | Research service of subpoena on C.Corp, a Delaware corporation, which has neglected to register with an agent for service of process in CA. (.4) |
| 10/22/19 | *EJB* | 2.0 | Work on C.Corp subpoena: decisional law on 2013 amendments and service of subpoena on C.Corp's Florida offices (1.7); call, T. Lustig re: C.Corp's Mary Spio's residence and work address (.3). |
| 10/22/19 | *MB* | 1.2 | Search online for possible addresses for C.Corp or Mary Spio; check California Secretary of State website; research rules on requirement that foreign corporations register with the secretary of |

| | | | state; request C.Corp 2018 annual report from Delaware Corporations Department. |
|---|---|---|---|
| 10/24/19 | *EJB* | 0.3 | Work on C.Corp subpoena to Florida location. |
| 10/24/19 | *MB* | 0.7 | Review C.Corp annual report received from Delaware Corporations Division; online research re: C.Corp's Florida address; attempt to locate current address for M. Spio. |
| 10/25/19 | *EJB* | 0.3 | Work on C.Corp subpoena. |
| 10/29/19 | *EJB* | 0.8 | Work on subpoena duces tecum to C.Corp. |
| 11/4/19 | *EJB* | 1.5 | Call, T. Lustig to discuss AzGen-Q.Corp SPV agreement (.3); revise declaration of Q.Corp CEO to reflect AzGen Analytics LLC and other valuation information (1.2). |
| 11/5/19 | *EJB* | 3.7 | Draft subpoena duces tecum to C.Corp, and revise (2.9); calls, T. Lustig to discuss terms of subpoena (.3); letter to C.Corp attorney, M. Indick (.5) |

## Drafting the Motion for Entry of Default Judgment

*We began drafting the motion in April, 2019.  In response to the Court's request, we informed the Court that we could file the motion by November 15.  We recommenced work on the motion, and completed it.*

| 11/6/19 | *EJB* | 5.8 | Revise draft memorandum in support of motion for entry of default judgment--legal standard, *Eitel* factors. |
|---|---|---|---|
| 11/6/19 | *MB* | 0.4 | Check Florida website for C.Corp registered agent; telephone call and email with Miami process server re: serving subpoena on C.Corp. |
| 11/7/19 | EJB | 6.1 | Write motion for entry of default judgment--fact section and claims. |
| 11/8/19 | EJB | 3.9 | Write motion for default judgment -- damages and milestones for $100k bonus; revise fact section. |
| 11/9/19 | EJB | 2.5 | Work on memorandum in support of motion for entry of default judgment--annual bonus, milestones, relief sought and revise Lustig declaration. |
| 11/10/19 | EJB | 2.1 | Work on memorandum in support of motion for entry of default judgment--valuation of Lustig's AzGen shares and revisions to Lustig declaration (1.8); call, R. Lichtman re: injunction to force AzGen to turnover Lustig's stock certificates and proceed with valuation appraisal (.3). |
| 11/11/19 | EJB | 6.9 | Work on memorandum in support of motion for entry of default judgment--damages section. |

| 11/12/19 | EJB | 7.3 | Work on motion for entry of default judgment -- calls with T. Lustig re: his declaration and revise declaration (1.5); attorneys' fees facts for Banchero declaration, and messages with J. O'Connor re contents (1.3); calls, R. Cortez Webb, lawyer for C.Corp (.3); work on damages calculations (1.2); go over entire draft and revise (3.0). |
| 11/12/19 | MBB | 1.5 | Research re procedure for filing documents under seal (.9); research re: recovering pre-litigation fees & costs (.6). |
| 11/13/19 | EJB | 8.8 | Draft motion for entry of default judgment--calls, T. Lustig re: his declaration and damages analyses (.5); email to Q.Corp Corp. lawyer re declaration (.2); draft damages section and revise Banchero declaration and Lustig declaration, attorney hours and descriptions of time (8.1). |
| 11/13/19 | MBB | 3.0 | Research re motion to file documents under seal (1.2); revise declarations of Lustig and Banchero (.7); review and revise memorandum (1.1). |
| 11/14/19 | MB | 3.8 | Cite-check brief (1.2); locate and compile exhibits to declarations (1.1); add evidentiary citations to brief (1.5). |
| 11/14/19 | EJB | 7.2 | Revise memorandum in support of motion for entry of default, and declarations of Banchero and Lustig in support of motion. |
| 11/15/19 | EJB | 4.3 | Revise memorandum in support of motion for entry of default, and declarations of Banchero and Lustig in support of motion. |

**TOTAL LEGAL FEES INCURRED**                                          **$    180,625.50**
  EJB  E. Jeffrey Banchero
    Attorney [partner] time, 245.0 hours at $645 per hour: $158,025.00
  MBB Mary Banchero
    Attorney time, 46.8 hours at $395 per hour: $18,486.00
  MB Mary Banchero
    Paralegal/attorney time, 21.1 hours at $195 per hour: $4,114.50

# EXHIBIT R

**BANCHERO LAW FIRM LLP**
*Anthony Lustig v. AzGen Scientific Holdings PLC*
Civil Action No. 18-cv-07503-HSG

**Costs Incurred**
June 2018 – November 2019

| | | |
|---|---|---|
| 6/30/18 | Lexis Advance: online legal research | $32.43 |
| 11/30/18 | Lexis Advance: online legal research | $27.35 |
| 12/31/18 | Deadlines on Demand: online calendaring | $20.00 |
| 12/31/18 | Lexis Advance: online legal research | $23.88 |
| 12/31/18 | Court filing fee: complaint; 12-13 | $400.00 |
| 1/31/19 | Lexis Advance: online legal research | $75.93 |
| 1/31/19 | Deadlines on Demand: online calendaring | $20.00 |
| 2/28/19 | Deadlines on Demand: online calendaring | $20.00 |
| 2/28/19 | Lexis Advance: online legal research | $70.60 |
| 3/31/19 | Deadlines on Demand: online calendaring | $20.00 |
| 3/31/19 | Lexis Advance: online legal research | $15.96 |
| 3/31/19 | Court Conference fee; 3/21 hearing | $35.00 |
| 4/30 /19 | Deadlines on Demand: online calendaring | $20.00 |
| 4/30/19 | Lexis Advance: online legal research | $23.96 |
| 5/31/19 | Deadlines on Demand: online calendaring | $20.00 |
| 5/31/19 | Lexis Advance: online legal research | $55.21 |
| 6/30/19 | Lexis Advance: online legal research | $29.32 |
| 6/30/19 | Deadlines on Demand: online calendaring | $20.00 |
| 7/31/19 | Lexis Advance: online legal research | $26.58 |
| 7/31/19 | Deadlines on Demand: online calendaring | $20.00 |
| 7/31/19 | CourtCall fee 7/25 | $35.00 |
| 8/31/19 | Deadlines.com: online legal calendaring | $20.00 |

| 8/31/19 | Lexis Advance: online legal research | $14.50 |
| 9/30/19 | Deadlines.com: online legal calendaring | $20.00 |
| 9/30/19 | D and R Legal Process Servers: 9/7 service on Q.Corp. (includes statutory witness fee $70). | $197.00 |
| 10/23/19 | Delaware Division of Corporations: fee for C.Corp. annual report | $32.00 |
| 10/23/19 | Federal Express: shipment from Del. Div. Corporations | $36.43 |
| 10/31/19 | Deadlines.com: online legal calendaring | $20.00 |
| 11/7/19 | Miami Processserver.com: 11/7 service of subpoena on C.Corp. | $155.25 |
| | **TOTAL COSTS** | **$1,506.40** |