1  E. Jeffrey Banchero (SBN 93077)
2  *ejb@bancherolaw.com*
   BANCHERO LAW FIRM LLP
3  601 California Street, 13th Floor
   San Francisco, California 94111
4  Telephone: (415) 398-7000
   Facsimile: (415) 484-7029
5
   Attorneys for Plaintiff
6  ANTHONY C. LUSTIG
7
8              **UNITED STATES DISTRICT COURT**
9            **NORTHERN DISTRICT OF CALIFORNIA**
10
11 ──────────────────────────────   CASE NO. 18-CV-07503-HSG
   ANTHONY C. LUSTIG,
12                                   **DECLARATION OF ANTHONY C.
            Plaintiff,               LUSTIG IN SUPPORT OF MOTION
13                                   FOR ENTRY OF DEFAULT
14     v.                           JUDGMENT**
15 AZGEN SCIENTIFIC HOLDINGS PLC,    Hearing Date: January 9, 2020
                                     Time:         2:00 P.M.
16          Defendant.               Courtroom:    2
                                     Before:       Hon. Haywood S. Gilliam, Jr.
17 ──────────────────────────────
18
19
20     I, Anthony C. Lustig, declare:

21     1.     I am the plaintiff in this action.  I have first-hand knowledge of the facts in this
22 declaration.  If called as a witness, I could and would testify competently to these facts.

23     2.     The First Amended Complaint ("complaint") is **Exhibit A** to this declaration.  I read
24 the complaint before it was filed, and I re-read it prior to signing this declaration.  The facts in the
25 complaint are true.  I refer to the defendant, AzGen Scientific Holdings PLC, as "AzGen."
26
27
28

**AzGen Hires Me to Work from California**

3.        Prior to AzGen, I served as Director of Mergers and Acquisitions at Lockheed Martin, and Director of Transactions Services/Contract Compliance with KPMG. I reside in San Jose, California. I lived in San Jose prior to working for AzGen, and I lived there throughout my employment with AzGen.

4.        Lauren Thomas is a business recruiter. In the spring of 2017, she sent me an e-mail message. Thomas wrote that her client, a venture capital firm, was seeking a Finance Executive to join their team. At the time, I was living and working in San Jose. She put me in touch with Linda Carter, who worked for AzGen and reported to Paul Gray. Gray, a U.S. citizen, founded AzGen and is, and was at that time, its Chairman and CEO. Carter interviewed me by telephone for the position. After the interview, Linda and Lauren set up an interview with Gray, who called me. Gray told me AzGen was looking to hire a finance professional with experience in mergers and acquisitions. Gray told me I would be an ideal fit, we think alike, and I could help AzGen from Silicon Valley.   I was in San Jose during these telephone calls with Thomas, Carter, and Gray.

5.        In June, 2017, Gray and I exchanged text messages. I downloaded the texts from my phone to my computer, and printed them. They are attached as **Exhibit B**.

On June 8, 2017, 4:20 A.M., Gray wrote:

"My employment attorney is weighing in on the letter so please hang with me."

On June 12, 2017, 7:51 A.M., Gray wrote:

"Will you be living in California or moving to another state?  The justification of contract should be where you live."

On June 12, 2017, 8:28 A.M., Gray wrote:

"Sorry I mean jurisdiction."

I responded that jurisdiction for the agreement should be in California.

On June 12, 2017, 8:33 A.M., Gray wrote:

"Super.  Will get you cover letter with terms.  We will have to work on contract together with California attorney for your protections.  Our firm here is coordinating."

-2-

DECLARATION OF ANTHONY C. LUSTIG                                         18-CV-07503-HSG

**My Employment Agreement**

6.     On about August 1, 2017, I signed a Letter of Offer AzGen.  A true copy of the Letter of Offer is attached hereto as **Exhibit C**.  The Letter of Offer is addressed to my residence in San Jose.  Gray also signed the Letter of Offer.

7.     The "Revised Contract," **Exhibit D** to this declaration, is a true copy of the employment agreement I signed with AzGen.  I signed the agreement on about January 27, 2018.  The agreement is addressed to my residence in San Jose, California.  Gray also signed the agreement.  It states, "You [Lustig] will be based in the San Francisco/California area."  I was not represented by legal counsel before or during the negotiations that led to my signing the Letter of Offer or the Revised Contract.

8.     For the period from August, 2017, to March, 2018, AzGen paid my salary by wire transfer.  AzGen sent the payments by wire to my Merrill Lynch account in Menlo Park, California.

9.     I worked for AzGen full-time during the period from August, 2017, to June 12, 2018—the day I received notice from AzGen's lawyers that the company had decided to terminate my employment.   During my employment with AzGen, I worked mainly from home in San Jose, making telephone calls and sending and receiving e-mail and text messages to AzGen officers and other AzGen representatives, and arranging and attending meetings in the San Francisco Bay Area.  In the first six months of my employment with AzGen (August to December, 2017), I spent approximately 70% of my time working in California.  During the period from January to July, 2018, I spent approximately 80% of my time working in California.

**AzGen's Investments in Two California Companies**

10.     During my time with AzGen, the company made substantial investments in two California-based companies.  My understanding is that the CEO of each of these corporations is submitting a confidential declaration describing the investments.  I was involved in the negotiations that led to both investments.  Luis Siemens is an officer and director of AzGen.  Siemens flew to California on AzGen's behalf to work with me and negotiate the terms of one of the investments.  On October 20, 2017, Siemens and I met one CEO at the Four Seasons Hotel in Palo Alto,

-3-

California.  Siemens subsequently came to California on AzGen's behalf on at least one other occasion.  AzGen maintained these investments while I was employed through and including July, 2018.

11.     I met with Gray in California on AzGen business on several occasions.   Gray made several trips to California in connection with AzGen's investments in the two California corporations.

**Annual Bonus—Milestones Achieved**

12.     My employment agreement, **Exhibit B**, provides for an "annual minimum potential bonus of US $100,000 based on completion of defined milestones."  I met with Gray regularly, at least once per month.  He outlined, and I agreed to, the following milestones for my first year with AzGen (2017-18):  (a) Identify investment opportunities in Silicon Valley; (b) Identify additional investment opportunities elsewhere in North America and Europe; (c) Develop criteria and a structured model for AzGen's investments; and (d) Develop a strategic plan for a global ICO (Initial Coin Offering) Fund.  I accomplished each of these milestones.  For example, through my efforts in Silicon Valley, AzGen invested in two California corporations.  I reviewed more than 35 potential investment opportunities for AzGen, and established a pipeline of more than 20 high-potential deals, which were presented to AzGen's board of directors.  I led discussions with a major European investment banking firm, which prepared detailed financial analyses of AzGen's business.  I introduced AzGen to global multi-national investment banks, asset management funds, European blockchain banks, and potential investor funds from the United States, Switzerland, and greater Europe.

**AzGen Stops Paying Me and Refuses to Reimburse Approved Travel Expenses**

13.     AzGen paid my salary from August 1, 2017, to March 31, 2018.  I did not receive salary after that date.

14.     On May 31, 2018, I sent Paul Gray an e-mail message, requesting that AzGen pay my salary for April and May, 2018.  The message is attached hereto as **Exhibit E.**  I included an expense reconciliation.  "Please note," I wrote, "my current expenses due is $8,638.72."  This

DECLARATION OF ANTHONY C. LUSTIG                                        18-CV-07503-HSG

amount represents personal funds that I spent on AzGen's business—mostly travel expenses—all of which were pre-approved by AzGen.

**Value of My Shares of Stock in AzGen**

15.     In January, 2018, AzGen deducted $1,200 from my monthly salary payment. Gray told me that AzGen had deducted this amount as "payment for my shares of stock in AzGen." He told me the stock transaction—the issuance of 4,000,000 shares of stock in AzGen to my account—was recorded in the minutes of AzGen's board meetings.

16.     After I was hired, Gray told me he had been working for ten years to lay the groundwork for AzGen—developing relationships with businesses and investors in different parts of the world that AzGen could exploit.

17.     In 2017, Gray and other AzGen associates wrote "We Know the Way," an illustrated video summarizing AzGen's finances and business model. The material states that AzGen has "spheres of influence across the globe"—"Dublin, Silicon Valley, Boston, Washington D.C., Malaysia, Montreal, and North Carolina, Madrid, Frankfurt, and London." "This has allowed [AzGen] to create a thriving ecosystem of patents, technologies, and companies that encourage innovation," including companies in life sciences ("a $1 billion portfolio"), advanced technologies, and material sciences. It reports AzGen has already "created $150 million in valuation increase" for its investors, "over a 500% return"—*i.e.*, AzGen's market value had increased by this amount since its founding. It states, "[w]e are looking at $15 billion in potential gains." A transcript of relevant portions of the video is attached to the declaration filed by my attorney, E. Jeffrey Banchero.

18.     AzGen also produced "AzGen Energy-Hydrogen" and "AzGen Energy Statistics," which describe AzGen's work with a Canadian-based hydrogen-conversion company. "AzGen Energy Statistics" states, "Our [AzGen's] revolutionary nano-electrolysis process uses 50 times less electricity than any other hydrogen manufacturing system currently in global use." "As [the world] switch[es] to more sustainable sources of energy, AzGen Hydrogen is already positioned to disrupt the billion-dollar marketplace with this ground-breaking technology." "With a 6.07%

DECLARATION OF ANTHONY C. LUSTIG                                      18-CV-07503-HSG

compound annual growth rate, our innovative process is set to revolutionize the world's energy sector." A transcript of relevant portions of the video is attached to the declaration filed by my attorney, E. Jeffrey Banchero.

19.     AzGen was backed by an investor associated with an international investment firm. On several occasions early in my tenure with AzGen and thereafter, Gray confirmed that AzGen had $150 million in assets to make investments. As one example, on September 28, 2017, Gray confirmed by text message, **Exhibit F** hereto, that AzGen had $30 million "in the bank" and could have $150 million "if we draw down." In May, 2018, Gray told me that the investor was arranging $10 billion for AzGen to invest.

20.     Gray told me that AzGen would have $400 million in annual revenues by year-end 2018.

21.     At no time was I in a position financially to file suit against AzGen in Ireland, or defend myself in any lawsuit AzGen might have filed in Ireland.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 15, 2019.

Anthony C. Lustig

DECLARATION OF ANTHONY C. LUSTIG                                      18-CV-07503-HSG

# EXHIBIT A

1  E. Jeffrey Banchero (SBN 93077)
2  *ejb@bancherolaw.com*
   BANCHERO LAW FIRM LLP
3  601 California Street, 13th Floor
   San Francisco, California 94111
4  Telephone: (415) 398-7000
   Facsimile: (415) 484-7029
5
   Attorneys for Plaintiff
6  ANTHONY C. LUSTIG

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    OAKLAND DIVISION

11

12  ANTHONY C. LUSTIG,                    CASE NO. 18-cv-07503-HSG

13           Plaintiff,                   FIRST AMENDED COMPLAINT

14      v.                                Breach of Contract, Nonpayment of
                                          Wages and Other Compensation, and
15  AZGEN SCIENTIFIC HOLDINGS PLC,        Waiting Time Penalties

16           Defendant.                   DEMAND FOR JURY TRIAL

17

18

19      Plaintiff, Anthony C. Lustig ("Lustig"), alleges:

20                    NATURE OF THE ACTION

21      1.      This is an action to recover due and unpaid wages, or salary in the amount of

22  $70,563 and the value of shares of stock that the defendant, AzGen Scientific Holdings Plc

23  ("AzGen" or the "company"), issued to Lustig as part of his compensation.  Lustig earned the

24  salary and the stock while serving as AzGen's Chief Investment Officer.  Lustig is also suing to

25  recover a $100,000 bonus and out-of-pocket, pre-approved travel expenses in an amount that

26  exceeds $7,000, which AzGen also refuses to pay.  Lustig asserts causes of action for breach of

27  contract, nonpayment of wages and other compensation, and waiting time penalties under

28  California Labor Code §203(a).

**PARTIES**

2.    Plaintiff Lustig is an individual who resides in San Jose, California.

3.    Defendant AzGen is a corporation organized under the laws of Ireland, with its principal place of business in Dublin, Ireland.

**JURISDICTION**

4.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, because the matter in controversy exceeds $75,000 exclusive of interest and costs, and plaintiff is a citizen of the State of California, and defendant is a citizen of a foreign state.

**VENUE**

5.    Venue lies within this district pursuant to 28 U.S.C. §1391(b)(2) and (3), because a substantial part of the events or omissions giving rise to the claims occurred in this district and, alternatively, because defendant is subject to the Court's personal jurisdiction with respect to this action.

**INTRADISTRICT ASSIGNMENT**

6.    On December 26, 2018, this Court issued an order assigning the case to the Honorable Haywood S. Gilliam, Jr., in the Oakland division.

**FACTUAL ALLEGATIONS**

7.    AzGen is an investment company.  The company seeks to identify and invest in so-called disruptive technologies in life sciences, material sciences, and other emerging technologies, such as crypto-currencies, virtual reality, data security, and artificial intelligence.  AzGen has spheres of influence in North America, Europe, and Asia, and is building a network of global banks and sovereign wealth funds.  In its first two years of business, AzGen created over $150 million in valuation increase, representing a 500% rate of return to AzGen's shareholders.

8.    AzGen hired Lustig in August, 2017 to serve as its Chief Investment Officer.  The position was based in the San Francisco, California area.  AzGen's offer letter stated that Lustig's annual salary would be $250,000.

9.    In December, 2017, AzGen and Lustig entered into a written employment agreement, which provides that he would continue to serve as the company's Chief Investment

FIRST AMENDED COMPLAINT – 18-CV-07503-HSG

1    Officer and continue to report to the CEO.  The employment agreement is attached as Exhibit A,

2    and incorporated by this reference as if set forth in full herein.  The agreement provides for a salary

3    of $1,000 a day, which AzGen agreed to pay on a monthly basis.  It provides that AzGen will

4    promptly reimburse Lustig for approved travel expenses.  It provides that Lustig is entitled to earn

5    an annual minimum potential bonus of $100,000 based on completion of defined milestones.

6          10.     The employment agreement (Exhibit A) also provides that the Board of Directors

7    approved an allotment for Lustig of "4,000,000 ordinary shares . . . in the capital of [AzGen] for a

8    relatively nominal consideration of €4,000," and that this amount of shares would be transferred to

9    him "in a single tranche"—*i.e.*, without a requirement that the shares vest over time.  The allotment

10   of these shares is memorialized in the company's board minutes.  Lustig paid a subscription price

11   for the shares.

12         11.     The employment agreement provides, further, that if Lustig's relationship with

13   AzGen or its affiliates ends, he is required to sell the 4,000,000 shares back to the company.

14   According to the agreement, if Lustig leaves the company of his own volition or AzGen terminates

15   his employment agreement other than for "Improper Behavior," the company is obligated to pay

16   Lustig market value for a percentage of the shares, calculated as follows:  the number of months

17   Lustig was employed by AzGen divided by 36 months, multiplied by 4,000,000 shares.  The

18   contract defines this amount of shares as "Value Shares."  The balance of the shares—*i.e*, shares

19   other than Value Shares— are to be retransferred from Lustig to AzGen not at market value, but at

20   the subscription price.

21         12.     AzGen employed Lustig during the period from August 1, 2017, to July 12, 2018.

22   Under the terms of the employment agreement, AzGen is obligated to pay Lustig the market value

23   for 1,333,333.33 shares (12 months / 36 months times 4,000,000 shares).  AzGen is obligated to

24   pay Lustig the subscription price for the balance of the 4,000,000 shares—*i.e.*, for 2,666,666.67

25   shares.

26         13.     AzGen paid Lustig a monthly salary that amounted to $250,000 annually—$20,833

27   a month.  Beginning in April, 2018, however, AzGen stopped paying Lustig.  At this time, AzGen

28   also refused to reimburse Lustig for approved travel expenses.

14. During April – May, 2018, Lustig sent e-mail messages to AzGen's CEO, Paul Gray, demanding payment for his salary and reimbursement for the travel expenses. Despite these demands, AzGen did not pay Lustig the salary he was owed or reimburse him for approved travel expenses. Neither Gray nor any other AzGen officer explained why AzGen was refusing to make these payments.

15. On June 12, 2018, AzGen's attorneys sent Lustig a letter terminating his employment agreement, effective July 12, 2018.

16. The lawyer's letter states, "As you have acted in bad faith and/or failed to disclose a conflict of interest in your dealings with CEEK VR," AzGen "regards this as an Improper Behavior Termination for the purposes of Clause 4 of the contract," which relates to the retransfer of Lustig's shares of stock. According to the letter, Lustig was now obligated to retransfer to AzGen's control all of the 4,000,000 shares that he had earned, not for market value, but for the subscription price. The letter concludes that AzGen would make no further payments to Lustig.

17. At no time prior to June 12, 2018, when Lustig received the lawyer's letter terminating his employment, did AzGen inform him that the company considered any of his actions to have been improper or in bad faith. Nor did AzGen inform Lustig prior to June 12, 2018, that the company believed Lustig had failed to disclose a conflict of interest with respect to CEEK VR.

18. There is no truth to the allegation that Lustig acted in bad faith or failed to disclose a conflict of interest in his dealings with CEEK VR. CEEK VR is a company AzGen invested in. AzGen entered into an agreement with CEEK VR, in which the two companies agreed to create an LLC to provide referral and consulting services for the financing, marketing, and sale of CEEK products. Under the LLC's operating agreement, Lustig and AzGen's CEO, Paul Gray, were appointed as two members of a three-person board of directors to manage the LLC. To the extent Lustig worked with CEEK VR, he did so at Paul Gray's direction, and with his knowledge. The grounds for termination set forth in the AzGen's lawyer's letter are wholly pretextual.

FIRST AMENDED COMPLAINT – 18-CV-07503-HSG

## FIRST CAUSE OF ACTION

### (Breach of Contract)

19.     Plaintiff repeats and realleges each of the allegations in paragraphs 1 through 18 as if set forth at length herein.

20.     Lustig performed each of the conditions set forth in the employment agreement (Exhibit A) between him and AzGen, including (a) serving AzGen as its Chief Investment Officer; (b) making a subscription payment for the 4,000,000 shares of stock; and (c) submitting itemized services to AzGen's CEO and Board with each monthly invoice.

21.     AzGen breached the employment agreement by failing and refusing to pay Lustig's salary for April and May, 2018, in the amount of $41,666; by failing and refusing to pay Lustig's salary for the period from June 1 to July 12, 2018, in the amount of $28,897; by failing and refusing to reimburse Lustig for his approved travel expenses, in an amount in excess of $7,000; by failing and refusing to pay Lustig a bonus of at least $100,000, or a bonus of any kind; by failing and refusing to pay Lustig the market value for his Value Shares (¶¶ 1, 2, & 5 of Exhibit A); and by failing and refusing to pay Lustig the subscription price for the balance of his 4,000,000 shares.

22.     AzGen's breach of the employment agreement has caused Lustig to suffer damages. These damages include (a) due, and unpaid wages, or salary of $70,563; (b) an amount in excess of $7,000 in approved travel expenses; (c) a bonus in the amount of $100,000; (d) the market value of Lustig's Value Shares, in an amount to be proven at trial; (e) reimbursement of the subscription price for the balance of Lustig's shares; and (f) pre-judgment interest on these amounts.

23.     Pursuant to Calif. Labor Code §218.5, Lustig requests that the Court award him reasonable attorneys' fees and costs incurred in bringing this cause of action for breach of a contractual obligation to pay wages.

## SECOND CAUSE OF ACTION
### (Nonpayment of Wages and Other Compensation; Violation of California Labor Code §201(a))

24.     Plaintiff repeats and realleges each of the allegations in paragraphs 1 through 18 as if set forth at length herein.

25.     Under Calif. Labor Code §201(a), when an employer discharges an employee, wages and other compensation earned and unpaid at the time of discharge are due and payable immediately.

26.     As of June 12, 2018, the date that AzGen provided Lustig with 30-days' notice that his employment would terminate, AzGen owed Lustig wages, or salary for two months' and twelve days' work—$49,730.  On July 12, 2018, following the expiration of the thirty-days' notice period, an additional 30 days' salary had accrued—*i.e.*, $20,833.  AzGen has also refused and failed to pay Lustig a salary for this 30-day period.

27.     In addition, upon discharge, AzGen owed Lustig a bonus in the amount of at least $100,000, and an amount equal to the market value of Lustig's Value Shares and the subscription price for the balance of his 4,000,000 shares.

28.     There is now due and owing to Lustig the sum of $70,563 in due and unpaid salary; a bonus of at least $100,000; an amount equal to the market value of his Value Shares and the subscription price for the balance of his 4,000,000 shares; and pre-judgment interest on these amounts.

29.     Pursuant to Calif. Labor Code §218.5, Lustig requests that the Court award Lustig reasonable attorneys' fees and costs incurred in bringing this cause of action for non-payment of wages and other compensation.

## THIRD CAUSE OF ACTION

### (Waiting Time Penalties Under California Labor Code §203(a))

30.     Plaintiff repeats and realleges each of the allegations in paragraphs 1 through 18 as if set forth at length herein.

31.     Under Calif. Labor Code §203(a), if an employer willfully fails to pay wages to an employee who is discharged, the wages of the employee continue as a penalty from the date the wages are due at the same rate until paid, for a period not to exceed 30 days.

32.     Lustig's last day of employment with AzGen was July 12, 2018.  AzGen did not pay Lustig's unpaid wages on that date, or on any subsequent date.  These unpaid wages are still owing.

1  Because AzGen's failure to pay Lustig's wages was willful, AzGen is liable for a penalty equal to
2  30 days' wages—*i.e.,* $20,833.

3  **PRAYER FOR RELIEF**

4       WHEREFORE, plaintiff, Anthony C. Lustig, prays for relief against defendant, AzGen
5  Scientific Holdings Plc, as follows:

6       a.     For compensatory and general damages according to proof;

7       b.     For a penalty under Calif. Labor Code §203(a), according to proof;

8       c.     For reasonable attorneys' fees and costs, pursuant to Calif. Labor Code §218.5;

9       d.     For costs of suit herein; and

10       e.     For such other and further relief as the Court may deem just and proper.

11

12       Respectfully Submitted,

13       BANCHERO LAW FIRM LLP

14
15       By:_____/s/_____
     E. Jeffrey Banchero

16       Attorneys for Plaintiff
17       Anthony C. Lustig

18

19

20  **JURY DEMAND**

21       Plaintiff, Anthony C. Lustig, demands a jury trial on all issues triable by jury.

22       BANCHERO LAW FIRM LLP

23
24       By:_____/s/_____
     E. Jeffrey Banchero

25       Attorneys for Plaintiff
26       Anthony C. Lustig

27

28

FIRST AMENDED COMPLAINT – 18-CV-07503-HSG

# EXHIBIT A

**EXHIBIT A**





Mr Tony Lustig

1684 Hydrangea Lane

San Jose, California 95124

U.S.A.

Date: December 29th, 2017

**Re: Revised Contract**

Dear Tony

I write on behalf of the Board further to our letter of 1 August setting out the terms and conditions of your initial engagement which you duly accepted.

**Shareholding Issues**

By way of update, I am pleased to confirm that on 6 October, 2017 the Board approved a number of share allotments and transfers to bring our issued share capital into line with various understandings.  Amongst the various resolutions passed was one approving the allotment to you of 4,000,000 ordinary shares of €0.001 each in the capital of AzGen Scientific Holdings PLC for a relatively nominal consideration of €4,000 of which an initial subscription payment of €1,000 should be made now and with your authority, we will deduct that from the next payment owing to you.

You will note that the number of shares exceeds the 2,500,000 referred to in the 1 August letter and this is to ensure that notwithstanding other share allotments, you will still have 10% of the issued share capital (subject to any future share allotments which may have the effect of diluting all shareholders *pro rata*).

Furthermore, rather than allot the shares in tranches that will vest ownership in you over a three year period, the entire allotment has been approved in a single tranche.

However, please note that the following terms and conditions attach to this share allotment:

1      Definition of "Value Shares". If your relationship with the company or any of its subsidiaries or affiliates (collectively, the "**Group**") ends or you are no longer acting in any capacity in relation to the Group's affairs whether as a consultant, employee, director or otherwise, the company will need to ensure that your shares come back to the company's control.  Depending on when or in what circumstances this may come to pass, different price considerations will apply. It is important to secure your services for at least three years and to ensure that you are fully incentivised during that time and beyond.

AzGen Scientific Holdings Plc Registered Company Number: 560700. | Executive Director, Paul Gray CEO & Chairman (USA)| Executive Director, Luis Siemens
Registered: 6 Upper Mount St. Dublin 2. DO2VF44, Ireland | Ph: 01 567 5430 | Email: info@azgen.com | www.azgen.com

**EXHIBIT A**

The starting point for the first 36 months will be:

- months worked/36 x no. of shares equals no. of "value shares".

The impact of this formula is that if you leave without having completed 36 months' service from August 1, 2017, you will only receive "Market Value" for that proportion of your shares and just the subscription price for the remainder. Once you have served more than 36 months, you will receive full market value subject to the following factors that will also be taken into account;

2      Value Share "Market Value". In circumstances where you are entitled to receive full "Market Value" for any or all of your shares, this will be determined by a panel of three independent experts; one appointed by the Board; one appointed by you; and the third appointment by agreement of the other two experts. In case the shares of the company were to trade in a Public Stock Exchange the average closing price per share of the last 30 trading days, prior to the date of the transaction, would be the reference price to determine the "Market Value";

3      Death, Incapacity or Departure Own Volition. In the event of your death, permanent incapacity or departure of your own volition, you (or your personal representatives) shall also be obliged to retransfer, if and when requested by the Board, to the company (or such person or persons as the Board may direct), all of the "Value Shares" as you may at such time hold (as calculated in paragraph 1) for a price equal to their then "Market Value" (as described in paragraph 2), while the balance of the shares shall be retransferred at the subscription price;

4      Improper Behaviour Termination. In circumstances where your departure occurs at any time in circumstances where the Group is lawfully entitled to terminate its relationship with you by reason of any fraud, dishonesty, gross negligence, wilful misconduct, bad faith or failure to disclose a conflict of interest or if you become bankrupt, you shall be obliged, when requested by the Board, to retransfer to the company (or such person or persons as the Board may direct), all of the shares as you may at such time hold for a price equal to the subscription price;

5      Termination by the Board. In the event you leave the Group or are no longer acting in any capacity in relation to the Group's affairs whether as a consultant, employee, director or otherwise, in circumstances where your departure being of the Board's volition (other for any of the reasons set out in paragraph 4 and 6) you shall be obliged to retransfer, if and when requested  by the Board, all or some of the "Value Shares" as you may at such time hold (as calculated in paragraph 1) for a price equal to their then "Market Value" (as described in paragraph 2) ), while the balance of the shares shall be retransferred at the subscription price.

6      Change in Control. In the event that a majority of the shareholders wishes to accept a *bona fide* third party offer for the sale of a controlling interest in the company and other than in the context of an offering to list the company's shares on Public Stock Exchange, you shall, if required to do so by the Board or by the proposed buyer, sell all of your shares to such buyer or such person or persons as the buyer shall direct on the same terms and per share valuation for your "Value Shares" (as calculated in paragraph 1) attached  to the sale of the controlling interest, while the balance of the shares shall be sold at the subscription price. The Board may

**EXHIBIT A**

approve, at its own discretion, that all of your shares shall be considered "Value Shares" without regard to the time you owned them and/or approve a premium of up to 100% for the price of your 'Value Shares" in case of a change in control situation;

7    <u>Attorney-in-fact</u>.  To give full effect to each of the foregoing conditions, you hereby appoint the company secretary for the time being as your attorney-in-fact to execute and deliver the required share transfer form(s);

8    <u>Sale of Own Shares</u>.  Unless the Board otherwise agrees, you may only offer your shares (whether all or any of them) for sale after the initial three year period referred to above. In the event of your wishing to do so then, you must first offer them *pro rata* to the company; if the company does not wish to purchase them or has insufficient distributable reserves to do so in compliance with Irish law, then you may offer them to the existing shareholders of the company; if none of the shareholders wish to purchase them or is willing to pay the price you are seeking, then you may sell them to any person who is not at that time a shareholder provided you first obtain the prior written consent of the Board, which consent may be withheld if the Board, acting reasonably, is of the view that it would not be in the best interests of the company to have any proposed purchaser as a shareholder.  In the case the company is trading in a Public Stock Exchange you are only entitled to sell your shares to the public following all the applicable laws and rules and guidelines of the Stock Exchange and the company;

9    <u>Voting Rights</u>.  Herewith you acknowledge and agree that your voting rights at shareholder meetings will be equivalent to the number of "Value Shares" versus total shares that you own.  The Board at its own discretion may grant you full voting right to all your shares during the first three years.

10   <u>Shareholders' Agreement</u>.  Please note that it may be necessary to adopt a shareholders' agreement in the context of any new investment coming into the company or other significant developments as the business grows, in which case the foregoing headlines terms will be incorporated in more detailed fashion.

**EXHIBIT A**

**Consulting Terms**

As regards your consulting terms, we wish to reconfirm and note the following:

- Your role will continue to be Chief Investment Officer;
- You will be based in the San Francisco/California area;
- You will continue to report to the company CEO;
- Your daily rate is US$1,000 per day worked (subject to submission of itemised daily activity records with your monthly invoice);
- The company will promptly reimburse for your approved travelling expenses upon submission of a proper monthly report and receipts;
- The four (4) million shares issued to you have a time dependent "Value Share" component as described in this document in substitution of the monthly vesting of shares first offered.
- You are entitled to earn an annual minimum potential bonus of US$100,000 based on completion of defined milestones;

For the sake of clarity, the following additional terms shall apply:

Subject to your entitlement to receive any earned but unpaid sums owing to you and the preservation of any other accrued rights or obligations of the parties, the company may terminate your consulting engagement on giving you not less than one months' notice and likewise you may terminate on giving the company one months' notice; and

Finally, we note that you have been paid to date as an independent contracting consultant on foot of invoices submitted to the company. Once instructed to do so by the company, please address all invoices together with itemised daily activities and expense claims to our US subsidiary AzGen North America, Inc. unless or until such time as you may be required to become an employee of that or any other Group company.

The remuneration for the employment position would be US$250,000 per annum and you would also be entitled to a company executive benefit plan (as stated in the August 1 letter), which includes a life insurance policy (determined by the board), once it becomes available.

This letter supersedes in all respects the letter of 1 August 2017.

**EXHIBIT A**

Please sign the attached copy of this letter and return it to the company to signify your acceptance of the terms set out above.

Yours sincerely

Paul Gray

For and on behalf of
AzGen Scientific Holdings PLC

I agree to the terms of this letter pursuant to the terms outlined above.

Tony Lustig

Date: 1/27/18

EXHIBIT A

# EXHIBIT B

6/8/17 4:20 AM (Viewed 6/8/17 6:55 AM)

Paul Gray [AzGen Scientific Holdings PLC] (7038017152)

My employment attorney is weighing in on the letter so please hang with me.

6/12/17 7:50 AM (Viewed 6/12/17 7:51 AM)

Paul Gray [AzGen Scientific Holdings PLC] (7038017152)

Will you be living in California or moving to another state? The justification of contract should be where you live.

6/12/17 8:28 AM

Paul Gray [AzGen Scientific Holdings PLC] (7038017152)

Sorry I mean jurisdiction

6/12/17 8:33 AM (Viewed 6/12/17 8:35 AM)

Paul Gray [AzGen Scientific Holdings PLC] (7038017152)

Super. Will get you cover letter with terms. We will have to work on contract together with California attorney for your protections. Our firm here is coordinating.

# EXHIBIT C



Mr. Tony Lustig
1684 Hydrangea Lane
San Jose, California USA 95124

August 1, 2017

**Subject to Contract**

**Re:    Letter of Offer**

Dear Tony:

We are delighted to be in a position to offer you the role of Chief Investment Officer with Azgen Scientific Holdings Public Limited Company ('the Company') reporting to the Chief Executive Officer. This offer is based on an employment contract to be provided and the role will be based in the San Francisco, California area.  While an employment contract is being prepared by the corporate attorney's we would offer an independent consulting contract as discussed with a daily rate of $1,000 per business day worked.

The remuneration for this employment position is $250,000 per annum.  Other benefits will be provided as will be outlined in your contract.

Your start date will be August 1, 2017.  You will receive your contract of employment in due course.

Please note that this offer is subject to the Company receiving your signed contract of employment.

In the meantime, should you have any further questions, please do not hesitate to contact me.

Yours sincerely,

Paul Gray, Chairman and CEO

ACKNOWLEDGEMENT
I agree to the terms set forth in this letter


_____          _____
Tony Lustig                                                     August 1, 2017

# EXHIBIT D



info@azgen.com
www.azgen.com
6 Upper Mount St.
Dublin 2, D02 VF44
Ireland

Mr Tony Lustig

1684 Hydrangea Lane

San Jose, California 95124

U.S.A.


Date: December 29th, 2017


**Re: Revised Contract**


Dear Tony


I write on behalf of the Board further to our letter of 1 August setting out the terms and conditions of your initial engagement which you duly accepted.

**Shareholding Issues**

By way of update, I am pleased to confirm that on 6 October, 2017 the Board approved a number of share allotments and transfers to bring our issued share capital into line with various understandings.  Amongst the various resolutions passed was one approving the allotment to you of 4,000,000 ordinary shares of €0.001 each in the capital of AzGen Scientific Holdings PLC for a relatively nominal consideration of €4,000 of which an initial subscription payment of €1,000 should be made now and with your authority, we will deduct that from the next payment owing to you.

You will note that the number of shares exceeds the 2,500,000 referred to in the 1 August letter and this is to ensure that notwithstanding other share allotments, you will still have 10% of the issued share capital (subject to any future share allotments which may have the effect of diluting all shareholders *pro rata*).

Furthermore, rather than allot the shares in tranches that will vest ownership in you over a three year period, the entire allotment has been approved in a single tranche.

However, please note that the following terms and conditions attach to this share allotment:

1       <u>Definition of "Value Shares"</u>. If your relationship with the company or any of its subsidiaries or affiliates (collectively, the **"Group"**) ends or you are no longer acting in any capacity in relation to the Group's affairs whether as a consultant, employee, director or otherwise, the company will need to ensure that your shares come back to the company's control.  Depending on when or in what circumstances this may come to pass, different price considerations will apply. It is important to secure your services for at least three years and to ensure that you are fully incentivised during that time and beyond.

The starting point for the first 36 months will be:

- months worked/36 x no. of shares equals no. of "value shares".

The impact of this formula is that if you leave without having completed 36 months' service from August 1, 2017, you will only receive "Market Value" for that proportion of your shares and just the subscription price for the remainder. Once you have served more than 36 months, you will receive full market value subject to the following factors that will also be taken into account;

2     <u>Value Share "Market Value"</u>.  In circumstances where you are entitled to receive full "Market Value" for any or all of your shares, this will be determined by a panel of three independent experts; one appointed by the Board; one appointed by you; and the third appointment by agreement of the other two experts.  In case the shares of the company were to trade in a Public Stock Exchange the average closing price per share of the last 30 trading days, prior to the date of the transaction, would be the reference price to determine the "Market Value";

3     <u>Death, Incapacity or Departure Own Volition</u>.  In the event of your death, permanent incapacity or departure of your own volition, you (or your personal representatives) shall also be obliged to retransfer, if and when requested by the Board, to the company (or such person or persons as the Board may direct), all of the "Value Shares" as you may at such time hold (as calculated in paragraph 1) for a price equal to their then "Market Value" (as described in paragraph 2), while the balance of the shares shall be retransferred at the subscription price;

4     <u>Improper Behaviour Termination</u>.  In circumstances where your departure occurs at any time in circumstances where the Group is lawfully entitled to terminate its relationship with you by reason of any fraud, dishonesty, gross negligence, wilful misconduct, bad faith or failure to disclose a conflict of interest or if you become bankrupt, you shall be obliged, when requested by the Board, to retransfer to the company (or such person or persons as the Board may direct), all of the shares as you may at such time hold for a price equal to the subscription price;

5     <u>Termination by the Board</u>.  In the event you leave the Group or are no longer acting in any capacity in relation to the Group's affairs whether as a consultant, employee, director or otherwise, in circumstances where your departure being of the Board's volition (other for any of the reasons set out in paragraph 4 and 6) you shall be obliged to retransfer, if and when requested by the Board, all or some of the "Value Shares" as you may at such time hold (as calculated in paragraph 1) for a price equal to their then "Market Value" (as described in paragraph 2) ), while the balance of the shares shall be retransferred at the subscription price.

6     <u>Change in Control</u>.  In the event that a majority of the shareholders wishes to accept a *bona fide* third party offer for the sale of a controlling interest in the company and other than in the context of an offering to list the company's shares on Public Stock Exchange, you shall, if required to do so by the Board or by the proposed buyer, sell all of your shares to such buyer or such person or persons as the buyer shall direct on the same terms and per share valuation for your "Value Shares" (as calculated in paragraph 1) attached  to the sale of the controlling interest, while the balance of the shares shall be sold at the subscription price. The Board may

approve, at its own discretion, that all of your shares shall be considered "Value Shares" without regard to the time you owned them and/or approve a premium of up to 100% for the price of your 'Value Shares" in case of a change in control situation;

7   <u>Attorney-in-fact</u>.  To give full effect to each of the foregoing conditions, you hereby appoint the company secretary for the time being as your attorney-in-fact to execute and deliver the required share transfer form(s);

8   <u>Sale of Own Shares</u>.  Unless the Board otherwise agrees, you may only offer your shares (whether all or any of them) for sale after the initial three year period referred to above. In the event of your wishing to do so then, you must first offer them *pro rata* to the company; if the company does not wish to purchase them or has insufficient distributable reserves to do so in compliance with Irish law, then you may offer them to the existing shareholders of the company; if none of the shareholders wish to purchase them or is willing to pay the price you are seeking, then you may sell them to any person who is not at that time a shareholder provided you first obtain the prior written consent of the Board, which consent may be withheld if the Board, acting reasonably, is of the view that it would not be in the best interests of the company to have any proposed purchaser as a shareholder.  In the case the company is trading in a Public Stock Exchange you are only entitled to sell your shares to the public following all the applicable laws and rules and guidelines of the Stock Exchange and the company;

9   <u>Voting Rights</u>.  Herewith you acknowledge and agree that your voting rights at shareholder meetings will be equivalent to the number of "Value Shares" versus total shares that you own.  The Board at its own discretion may grant you full voting right to all your shares during the first three years.

10   <u>Shareholders' Agreement</u>.  Please note that it may be necessary to adopt a shareholders' agreement in the context of any new investment coming into the company or other significant developments as the business grows, in which case the foregoing headlines terms will be incorporated in more detailed fashion.

**Consulting Terms**

As regards your consulting terms, we wish to reconfirm and note the following:

- Your role will continue to be Chief Investment Officer;
- You will be based in the San Francisco/California area;
- You will continue to report to the company CEO;
- Your daily rate is US$1,000 per day worked (subject to submission of itemised daily activity records with your monthly invoice);
- The company will promptly reimburse for your approved travelling expenses upon submission of a proper monthly report and receipts;
- The four (4) million shares issued to you have a time dependent "Value Share" component as described in this document in substitution of the monthly vesting of shares first offered.
- You are entitled to earn an annual minimum potential bonus of US$100,000 based on completion of defined milestones;

For the sake of clarity, the following additional terms shall apply:

Subject to your entitlement to receive any earned but unpaid sums owing to you and the preservation of any other accrued rights or obligations of the parties, the company may terminate your consulting engagement on giving you not less than one months' notice and likewise you may terminate on giving the company one months' notice; and

Finally, we note that you have been paid to date as an independent contracting consultant on foot of invoices submitted to the company. Once instructed to do so by the company, please address all invoices together with itemised daily activities and expense claims to our US subsidiary AzGen North America, Inc. unless or until such time as you may be required to become an employee of that or any other Group company.

The remuneration for the employment position would be US$250,000 per annum and you would also be entitled to a company executive benefit plan (as stated in the August 1 letter), which includes a life insurance policy (determined by the board), once it becomes available.

This letter supersedes in all respects the letter of 1 August 2017.

Please sign the attached copy of this letter and return it to the company to signify your acceptance of the terms set out above.

Yours sincerely

Paul Gray

For and on behalf of
**AzGen Scientific Holdings PLC**

I agree to the terms of this letter pursuant to the terms outlined above.

**Tony Lustig**

Date: 1/27/18

# EXHIBIT E

**From:** Tony Lustig
**Sent:** Thursday, May 31, 2018 3:57 PM
**To:** Paul Gray <pgray@azgen.com>
**Cc:** Tony Lustig (tlustig@azgen.com) <tlustig@azgen.com>
**Subject:** Payment and Expenses (Reconciled)

Hi Paul,

Attached is my invoice for May and my outstanding expenses.

I completed an expense reconciliation.  See attached.  Please note my current expenses due is $8,638.72.

I would kindly appreciate you paying my invoice for April and May.

Thank you very much,
Tony

 | Mobile (+1) 408 309-9172
6 Upper Mount St, Dublin 2
www.azgen.com

Tony Lustig | Chief Investment Officer

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Lustig Expense Check**
Dated:  May 31, 2018

| | | Merrill Lynch Wires Received for Lustig Expenses | | | | |
|---|---|---|---|---|---|---|
| Settle Date | Type | Description | $ | Wage Part | Expense | Notes |
| 7/19/2017 | FundTransfers | Transfer In | $11,220.18 | | $11,220.18 | |
| 8/25/2017 | FundTransfers | Transfer In | $10,000.00 | | $10,000.00 | Advance for expenses |
| 10/10/2017 | FundTransfers | Transfer In | $16,360.41 | | $16,360.41 | |
| 12/12/2017 | FundTransfers | Transfer In | $5,106.42 | | $5,106.42 | |
| 2/15/2018 | FundTransfers | Transfer In | $27,624.50 | $20,833.00 | $6,791.50 | Wage and expenses combined |
| 3/8/2018 | FundTransfers | Transfer In | $10,379.87 | | $10,379.87 | Incl $1,200 stock |
| | | Total | | | $58,658.38 | |

| Expense Balance Check | | |
|---|---|---|
| Expense Submit Date | Amount $ | Notes |
| 7/17/2017 | $9,114.36 | |
| ~~7/27/2017~~ | ~~$804.31~~ | Mistakenly duplicated in 8/16/17 submittal. |
| 8/16/2017 | $5,841.50 | |
| 10/6/2017 | $16,360.41 | |
| 11/20/2017 | $5,106.42 | |
| 1/2/2018 | $5,388.44 | |
| 2/5/2018 | $6,791.50 | |
| 3/4/2018 | $3,588.37 | |
| 3/31/2018 | $8,309.66 | |
| 4/30/2018 | $5,600.06 | |
| 5/31/2018 | $1,196.38 | |
| | | |
| Total | $67,297.10 | |

Expense Reimbursement Due   $8,638.72   Current as of May 31, 2018

# EXHIBIT F

9/28/17 3:45 AM

Tony's iPhone (+14083099172)

Let me reconfirm we $150M in the bank, right?

9/28/17 3:49 AM (Viewed 9/28/17 3:57 AM)

Paul Gray [AzGen Scientific Holdings PLC] (7038017152)

We have if we draw down. We have only drawn down 30

9/28/17 3:58 AM

Tony's iPhone (+14083099172)

Well, I told him we had $150M. How long would it take to get $100M in the bank?

9/28/17 3:59 AM

Paul Gray [AzGen Scientific Holdings PLC] (7038017152)

As soon as we request.